NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,

v.

Clayton YEUTTER, Secretary of Agriculture, et al., Defendants.

Civ. A. Nos. 88–2515, 88–2668.

United States District Court, District of Columbia.

Jan. 18, 1990.

Elaine Kaplan, Gregory O'Duden and Clinton D. Wolcott, National Treasury Employees Union, Washington, D.C., for National Treasury Employees Union.

Kim D. Mann, Washington, D.C., for National Ass'n of Agriculture Employees.

Peter Robbins and Mary E. Goetten, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

The National Treasury Employees Union ("NTEU") and the National Association of Agricultural Employees ("NAAE"), which are collective bargaining representatives for certain employees of the U.S. Department of Agriculture ("USDA" or "the government"), have moved for summary judgment on the constitutionality of various aspects of the USDA's Drug Free Workplace Program (the "plan" or "program"). Specifically, the plaintiff unions have asked this court to make permanent the preliminary injunction it entered against the USDA's plan subjecting various members of the plaintiffs' collective bargaining units to random urinalysis testing for drugs.[1] The government defendants, the Secretary of Agriculture and other officers, have in turn filed a cross motion for summary judgment that essentially seeks to remove any obstacles to implementing the urinalysis testing program.

After balancing the employees' privacy interests against the government's asserted interests in support of the various aspects of the testing program, this court permanently enjoins the USDA from implementing the random urinalysis testing provisions of the plan as applied to non-management Plant Protection and Quarantine Officers, and computer specialists. The court, however, grants the defendants' motion for summary judgment on the re-

maining counts of the underlying complaints in this consolidated action.[2]

### I

NTEU is the collective bargaining representative of about 812 employees of the USDA's Food and Nutrition Service ("FNS"). All of the employees represented by NTEU will be subject to the program's post-accident and "reasonable suspicion" urinalysis testing for drugs. A total of five employees represented by NTEU will be subject to random urinalysis testing for drugs. These employees fall into two job categories, motor vehicle operators (three employees) and computer specialists (two employees). At least one of the employees in each of the two job categories is also a member of NTEU. Finally, NTEU also challenges the program's applicant testing provisions on behalf of the three motor vehicle operators who they allege would be subject to this requirement when seeking promotions.[3]

NAAE is the exclusive collective bargaining unit representing approximately 1,000 non-management employees of the Plant Protection and Quarantine ("PPQ") program within the USDA's Animal and Plant Health Inspection Service ("APHIS"). Some 600 NAAE members (and about 761 non-management PPQ officers total) will be subject to random, reasonable suspicion and post-accident testing. The defendants in these cases include President Bush, USDA Secretary Yeutter, and the current FNS and APHIS administrators.

### II

A description of the history and operation of the USDA's plan was amply set out

---

**1.** The plaintiffs have also moved for a permanent injunction against other types of urinalysis testing for drugs specified in the plan, including applicant testing and post-accident testing. Neither of these provisions of the plan was addressed by this court's earlier ruling. Finally, the plaintiffs again ask the court to find that the plan's proposed "reasonable suspicion" testing of all USDA employees is unconstitutional under the Fourth Amendment.

**2.** As detailed below, the court finds that the USDA's reasonable suspicion and post-accident testing provisions are reasonable under the appropriate Fourth Amendment balancing test. The court lifts its injunction against the testing

of motor vehicle operators and grants the defendants' motion for summary judgment in regard to motor vehicle operators. The court finds that the plaintiffs lack standing to challenge the internal applicant testing provisions of the plan and that their objections to the testing provision under the Civil Service Reform Act and the Rehabilitation Act are premature at this time.

**3.** The court notes that NTEU challenges only the so-called internal applicant urinalysis testing for drug provisions of the plan. They do not here challenge the applicant testing provisions as applied to external applicants.

in this court's earlier opinion. *National Treasury Employees Union v. Lyng*, 706 F.Supp. 934, 936–40 (D.D.C.1988). Those portions of the opinion are incorporated by reference here as well. For the purposes of deciding the current motion, only a brief summary of the relevant background facts follows.

On August 8, 1988, under authority granted by President Reagan in Executive Order 12564,[4] the USDA announced the details of its Drug Free Workplace Plan. U.S. Agriculture Dep't Personnel Manual Supp. 792–3 ("DPM Supp."). Although acknowledging that illegal drug use among its employees was "low when compared to the number of employees" in the Department, the program included provisions for urinalysis testing for drugs in six categories: 1) applicant testing, 2) random testing, 3) reasonable suspicion testing, 4) injury, illness, unsafe or unhealthful practice testing, 5) voluntary testing, and 6) testing as part of or as follow-up to counseling or rehabilitation. DPM Supp. at 1.[5]

As noted, the plan calls for injury, illness, unsafe or unhealthful practice ("post-accident") testing. Under this provision, any USDA employee must undergo urinalysis testing for drugs when that employee has "on-the-job apparently caused" one or more fatalities, the hospitalization of one or more persons, or damage to property in excess of $10,000. DPM Supp. at 18.

The plan also calls for urinalysis testing for drugs of applicants to certain safety-related positions in the Department.[6] This requirement applies both to individuals tentatively selected for employment from outside the Department and individuals tentatively selected for movement from within the service to one of these safety-related positions. DPM Supp. at 17. Under the

plan, an otherwise successful applicant will be directed to an appropriate collection facility and must provide a sample "as soon as possible" and no later than 48 hours after notification. *Id.* All agencies within the Department will decline to extend final offers of employment to any applicant with a verified positive test result. *Id.* The only position subjected to applicant testing at issue here are motor vehicle operators.

### III

Since this court ruled on the plaintiffs' preliminary injunction motion, the legal framework for analyzing the Fourth Amendment implications of governmentally compelled urinalysis testing for drugs has changed. The disposition of the pending motion is now largely controlled by five recent decisions involving constitutional challenges to suspicionless, governmentally sponsored urinalysis testing for drugs. The first two decisions were issued by the Supreme Court and involved challenges to post-accident testing in the railroad industry, *Skinner v. Railway Labor Executives Association*, —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and to applicant testing for certain positions in the Customs Department. *National Treasury Employees Union v. Von Raab*, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The three most recent decisions, issued by the United States Court of Appeals for the District of Columbia Circuit, involved challenges to random testing in the Department of Justice, *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), random testing of various civilians in the Department of the Army, *National Federation of Federal Employees ("NFFE") v. Cheney*, 884 F.2d 603 (D.C.Cir.1989), and random testing of

---

**4.** The Executive Order, titled "Drug–Free Federal Workplace," was issued on September 15, 1986, and appeared at 51 Fed.Reg. 32,889 (1986).

**5.** Testing is conducted in five drug categories: marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP). DPM Supp. app. B at 1. On August 16, 1988, the Department individually notified occupants of so-called Testing Designated Positions (TDPs) that random testing would commence in thirty days. USDA Ass't

Sec'y for Admin Notice Memo. A series of administrative decisions and then this court's order entered on December 8, 1988, has prevented any random testing from being conducted for those TDPs covered by this litigation. *Lyng*, 706 F.Supp. at 937 & n. 6.

**6.** These are all "Testing Designated Positions"— i.e. they are also subject to random testing under the plan. DPM Supp. at 14, 17.

certain employees in the Department of Transportation. *American Federation of Government Employees ("AFGE") v. Skinner*, 885 F.2d 884 (D.C.Cir.1989).

■ These decisions have established certain general principles. First, because "collection and testing of urine samples intrudes upon expectations of privacy that society has long recognized as reasonable," government-sponsored urine testing for drugs "must be deemed [a] search[ ] under the Fourth Amendment." *Skinner*, 109 S.Ct. at 1413; *Von Raab*, 109 S.Ct. at 1390 (Fourth Amendment protects against "unreasonable" searches conducted by the Government when it "acts as an employer"). But, the recognition that the Fourth Amendment applies to urine testing only starts the inquiry because the Fourth Amendment forbids only "unreasonable" searches and seizures. *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1413–14; *AFGE v. Skinner*, 885 F.2d at 889 ("This approach necessarily recognizes that not every invasion of privacy is proscribed by the Fourth Amendment.").

■ While a search must usually be supported by a warrant and probable cause to meet the Fourth Amendment's reasonableness requirement, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1414–16, 1417 ("We have made it clear, however, that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable."). Instead, the Court has recognized "that where a Fourth Amendment intrusion serves special needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to

determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1414.

After finding that certain special governmental needs existed in both *Skinner* and *Von Raab*, the Court applied this balancing test and sustained different types of suspicionless drug testing.[7] In *Skinner*, the Court found that the government's "surpassing" interest in ensuring the safety of the railroad industry outweighed the covered train workers' diminished expectations of privacy and sustained Federal Railroad Administration regulations that required blood and urine tests following certain types of accidents. In *Von Raab*, the Court found that the government's compelling interest in the integrity of the country's borders and in protecting the public outweighed the diminished privacy interests of the affected employees and sustained suspicionless, urinalysis testing for drugs of applicants to certain positions inside the Customs Department.

As recognized by the D.C. Circuit, the Supreme Court's decisions underscore certain additional principles important to the analysis here. First, the Court's decision in *Von Raab* indicates "that a documented drug problem ... within a particular work place" need not be shown to justify a suspicionless drug testing program. *Harmon*, 878 F.2d at 487; *AFGE v. Skinner*, 885 F.2d at 895 ("*Von Raab* indicates that a history of intra-agency drug use is not an essential ingredient in establishing the reasonableness of a testing regime."). Second, while "a coherent theory might be constructed which would make" the privacy intrusion occasioned by a random urinalysis testing program "a fundamental distinction" from the analysis in *Von Raab*, the D.C. Circuit noted that "the Supreme

---

7. In *Von Raab*, the Supreme Court held that the Customs Service's need to "deter[ ] drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions" presented the kind of "special need," beyond the normal need for law enforcement, that could justify "departure from the ordinary warrant

and probable cause requirements." 109 S.Ct. at 1391. In *Skinner*, the Court found that the government's interest in regulating the conduct of railroad employees to ensure "the safety of the traveling public and of the employees themselves" presented a special need that could justify departure from the usual warrant and probable cause requirements. 109 S.Ct. at 1414–15.

**408**

Court has not encouraged the construction of such a theory." *Harmon,* 878 F.2d at 489. Instead, the D.C. Circuit has concluded that the random nature of a challenged urinalysis testing program is only a *"relevant consideration"* to be factored into the balancing test which, "in a particularly close case ... would [possibly] tip the scales [against sustaining a particular program]." *Id.* (emphasis in original); *Cheney,* 884 F.2d at 608–09 (" 'the random nature of the [subject] testing plan is a *relevant* consideration,' but does not 'require[ ] us to undertake a fundamentally different analysis from that pursued by the Supreme Court.' " (quoting *Harmon,* 878 F.2d at 489)); *AFGE v. Skinner,* 885 F.2d at 891 ("While it is true that the regulations sustained in *Skinner* required testing only after a triggering event ... we do not find that ... [this] fact[ ] compels 'a fundamentally different analysis from that pursued by the Supreme Court.' " (quoting *Harmon,* 878 F.2d at 489)).[8]

## IV

Although the analytical framework used by the Supreme Court in *Skinner* and *Von Raab* has apparently discarded the two-pronged inquiry mandated by the D.C. Circuit (and applied by this court) that required a Fourth Amendment intrusion to be justified at its inception and reasonably related in scope to the circumstances that first justified the intrusion, *Jones v. McKenzie,* 833 F.2d 335, 339 (D.C.Cir.1987), *vacated and remanded,* —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989), and

*National Federation of Federal Employees ("NFFE") v. Weinberger,* 818 F.2d 935, 943 (D.C.Cir.1987), the essential elements in the balancing test remain the same. The court must again weigh the strength of the government's asserted interests supporting the urinalysis testing program against the individual's privacy interests to determine if the intrusion is reasonable under the Fourth Amendment.[9]

The D.C. Circuit confirmed this conclusion in *Cheney:*

"In *Von Raab* and *Skinner* the Supreme Court laid out a balancing test that, while not self-executing, focuses our attention on a single question: Does the government's need to conduct the suspicionless searches outweigh the privacy interests of the covered employees in such a fashion that it is 'impractical to require a warrant or some level of individualized suspicion?' "

*Cheney,* 884 F.2d at 608; *see also AFGE v. Skinner,* 885 F.2d at 889.

The nature of the balancing test employed by *Skinner* and *Von Raab* was aptly summarized by the D.C. Circuit in *Harmon:* "The Supreme Court has quite clearly eschewed an approach to drug testing based on bright lines and clean analytic principles, and has instead mandated case-by-case balancing of individual and societal interests." *Harmon,* 878 F.2d at 490 n. 9.[10] This court now turns to the balancing of these interests here.

The D.C. Circuit acknowledged that the Supreme Court has "recognized [in

---

**8.** The D.C. Circuit's recognition that the random nature of a proposed urinalysis testing program for drugs could at least "tip the scales" against sustaining a program in a close case, *Harmon* 878 F.2d at 489, confirms this court's earlier finding that random drug testing was at the outer most edge of legitimacy under the Fourth Amendment. *Lyng,* 706 F.Supp. at 941.

**9.** This court finds, for the record, that the Department's plan "serves special governmental needs, beyond the normal need for law enforcement." *AFGE v. Skinner,* 885 F.2d at 889 (quoting *Von Raab,* 109 S.Ct. at 1390). The court notes that "[l]aw enforcement appears nowhere among the program's stated goals, and more to the point, non-consensual disclosure of test re-
sults to police authorities is proscribed" by the plan. *Id.;* DPM Supp. at 21 (describing the limitations on release of test results).

**10.** Indeed, the Court of Appeals noted that the application of *Von Raab* presented a "delicate task" because the Supreme Court "made no effort to articulate an analytical rule by which legitimate drug-testing programs could be distinguished from illegitimate ones." *Harmon,* 878 F.2d at 488. In particular, the Court failed to indicate which of the relevant factors enumerated by the Court in balancing the government's policy objectives against the individual's privacy interests were *essential* to a constitutional testing plan." *Id.* at 488–89 (emphasis in original).

*Skinner* and *Von Raab* ] three governmental interests which might, in appropriate circumstances, be sufficiently compelling to justify mandatory testing in the absence of individualized suspicion." *Harmon*, 878 F.2d at 488. As identified by the D.C. Circuit, these interests were: 1) maintaining the integrity of its work force, 2) enhancing public safety, and 3) in protecting sensitive information. *Id.* The government defendants here have asserted variations of these three interests to justify random drug testing of the three testing designated positions at issue. The court will consider each of these positions in turn.

### Plant Protection and Quarantine Officers

The government defendants argue that random testing of the PPQ officers is justified by the compelling government interest "in ensuring front-line [drug] interdiction personnel are physically fit, and have unimpeachable integrity." Deft's Reply at 18 (quoting *Von Raab* ). They argue that PPQ officers, like the Customs Officers in *Von Raab*, are "in an ideal position to assist drug smugglers if under the influence of criminal elements." *Id.* at 19.[11] In short, the government defendants rely upon the Supreme Court's recognition in *Von Raab* of the government's compelling interest "in the integrity of our borders" to justify testing to ensure that "front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Von Raab*, 109 S.Ct. at 1393.

The government argues here that these PPQ officers, like certain other types of public employees, have " 'diminished privacy expectations' with respect to urinalysis." Deft's Reply at 16 (quoting *Von Raab*, 109 S.Ct. at 1393). The defendants again rely on the Supreme Court's conclusion in *Von Raab* that "Customs employees who are

directly involved with the interdiction of illegal drugs ... reasonably should expect effective inquiry into their fitness and probity." *Von Raab*, 109 S.Ct. at 1394. The defendants argue that some 150 PPQ officers are cross-designated as customs agents, and thus directly involved in drug interdiction efforts, and that all PPQ officers "work in close proximity with Customs Service agents and must cooperate with Customs officials in the event they find illegal drugs during their inspections." Deft's Reply at 17. In sum, the government argues that its compelling interest in "the integrity of our borders" balanced against the PPQ officers' diminished expectation of privacy justifies random drug testing.

The court rejects this argument. The court finds that the government's interest in testing these PPQ officers is nowhere near the compelling interest identified by the Supreme Court in *Von Raab*. In fact, this court has already expressed its dissatisfaction with the government's asserted interest here:

PPQ officers are statutorily responsible for preventing pests and animal diseases from entering the United States. Pursuant to this authority, they inspect cargo coming in from foreign countries aboard planes and ships as well as baggage of passengers arriving at international ports of entry. *These officers are administrative employees, not law enforcement personnel. They do not carry weapons and are not authorized to make arrests. They receive no training in drug identification, detection or interdiction. Furthermore, they have no drug interception responsibilities.* Consistent with the relatively non-sensitive nature of their assignments, APHIS has consistently assigned these positions a zero sensitivity rating in job vacancy

---

11. The defendants quote language in *Von Raab*, also relied upon by the D.C. Circuit in *Harmon*, as additional support for their compelling interest here. They argue that a PPQ officer's indifference to interdiction efforts, or worse, his active complicity with drug traffickers could "facilitate importation of sizable drug shipments

or block apprehension of dangerous criminals." Deft's Reply at 18 (quoting *Von Raab*, 109 S.Ct. at 1393); *see Harmon*, 878 F.2d at 490 (noting risks if attorneys charged with prosecuting drug offenders were "unsympathetic to their mission of interdicting narcotics").

announcements (Form AD–332) and personnel actions (Form 50–B).

*Lyng,* 706 F.Supp. at 946 (emphasis added). Simply put, these PPQ officers do not remotely resemble this nation's "first line of defense against one of the greatest problems affecting the health and welfare of our population." *Von Raab,* 109 S.Ct. at 1392.

This conclusion follows the D.C. Circuit's reasoning in *Cheney,* where the court discussed the government's integrity interest in random testing. The court noted that in its view, the compelling interest in integrity recognized by the Supreme Court in *Von Raab* rested "not so much on the [Customs] Service's undifferentiated interest in ensuring its reputation and credibility as on the myriad dangers posed by drug-using interdiction agents." *Cheney,* 884 F.2d at 613. Following from this interpretation, the court required either "a clear, direct nexus between the duties" of an employee to be tested "and the nature of the feared violation" or a "compelling reason to expect that [an employee's] drug use will result in misplaced sympathies for their responsibilities" before it would sanction any proposed program of random urinalysis testing under the integrity interest. *Id.* at 614.

In applying this requirement, the court sustained random testing of civilian drug counsellors in the Army's Alcohol and Drug Abuse Prevention and Control Program. The court first noted that it was "apparent that drug counsellors who themselves use drugs, like drug-using interdiction agents, may 'because of their own drug use, be unsympathetic to their mission.'" *Id.* The court concluded that

"while the consequences of a drug counsellor's misplaced sympathies may not be as extreme as those attributable to drug use by drug interdiction personnel ... the Army maintains a legitimate interest in ensuring that its employees are allegiant to their *essential* mission." *Id.* (emphasis added).[12]

Here, the essential mission of these PPQ officers is to prevent the influx of plant pests and animal diseases into this country. This court finds neither a sufficient "clear, direct nexus" between the duties of *these* employees and the feared violation nor a "compelling reason" to expect that drug use by these PPQ officers will result in misplaced sympathy to their essential mission of eradicating the scourge of plant pests and animal diseases in this country.

Furthermore, because of the relatively non-sensitive nature of their jobs, this court finds that these PPQ officers do not have a diminished expectation of privacy. This conclusion is supported by the Supreme Court's reasoning in *Von Raab.* In documenting its decision that certain "operational realities" combined to diminish the expectations of privacy of Customs officers engaged in drug interdiction with respect to personal searches, the Supreme Court noted initially that "these operational realities will rarely affect an employee's expectation of privacy with respect to such personal searches." *Id.* at 1393. The Court however concluded that "[u]nlike most private citizens or *government* employees in general," Customs officers involved in drug interdiction efforts "reasonably should expect effective inquiry into their fitness and probity." *Id.* at 1394.[13] This

12. The D.C. Circuit required the same "clear, direct nexus" between the employee's duty and the nature of the feared violation before it would sanction testing under the government's integrity interest in *Harmon. Harmon,* 878 F.2d at 490. The court found no such nexus in *Harmon* by concluding that "[t]he fact that a DOJ employee is a federal prosecutor, has access to grand jury proceedings, or holds a security clearance in no way identifies her as an employee responsible for the enforcement of federal narcotics laws." *Id.* Similarly, the fact that these PPQ officers work near Customs offi-

cers in no way identifies them as responsible for enforcing the federal narcotics laws.

13. *See Harmon,* 878 F.2d at 490 (rejecting argument that government's integrity interest justified testing of every federal employee, quoting highlighted passage from *Von Raab* ). This conclusion is also supported by the D.C. Circuit's decision in *Cheney.* In finding that drug counsellors in the Army's Alcohol and Drug Abuse Prevention and Control Program have a diminished expectation of privacy, the court concluded: "illicit drug use by an employee whose as-

court finds that the nature of these PPQ officers' duties, like most government employees, does not diminish their privacy expectations with respect to random urinalysis testing.

Thus, because the government's integrity interest in randomly testing these PPQ officers falls far short of the compelling interest that the Supreme Court identified in *Von Raab* and because these PPQ officers do not have a diminished expectation of privacy, the court finds that this portion of the plan's random testing provision is unreasonable under the Fourth Amendment.[14] The court notes additionally that this result conforms to the one sanctioned by the D.C. Circuit in *Harmon*. *Harmon*, at 490 ("It seems quite possible that the Department [of Justice] might constitutionally fashion a random drug-testing program for all DOJ employees having *substantial responsibility* for the prosecution of federal drug offenders.") (emphasis added).

### Computer Specialists

■ The government argues that its compelling interest in protecting sensitive information justifies the random urinalysis testing of the computer specialists at issue here. Deft's Reply Mem. at 19. The government notes that the two computer specialists at issue here are responsible for safeguarding highly sensitive information stored in FNS computers across the country, information vital to the administration of federal anti-poverty programs. Naugh-

ton Dec. ¶¶ 3–4. The government points to the risk that this "sensitive information" could be compromised by someone "under compulsion of circumstances or for other reasons" to lend support to its view that this interest is sufficiently compelling to justify random urinalysis testing here. Deft's Reply Mem. at 19.

The government again relies on language in *Von Raab* to support its argument. In this context, the government relies on the admonition by the Court that "the Government has a compelling interest in protecting truly sensitive information from those who, 'under compulsion or for other reasons, ... might compromise such information.'" *Von Raab*, 109 S.Ct. at 1396 (quoting *Department of the Navy v. Egan*, 484 U.S. 518, 527, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988)). The government relies as well on additional dictum from *Von Raab* indicating that applicants seeking promotion to positions handling sensitive information could be tested without suspicion "especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test." *Id.* at 1397.

The court rejects this argument. In so ruling, the court follows its initial holding that the information at issue here, and hence the government's asserted interest "is of a different (and less compelling) degree entirely" from the type of national

---

signed duty is to counsel against the use of drugs is so dissonant with his responsibilities, he should reasonably expect to provide extraordinary assurances of trustworthiness and probity." *Cheney*, 884 F.2d at 614. Here, while not questioning "the obvious principle that the government has a legitimate interest in ensuring that its employees obey the law," *Harmon*, 878 F.2d at 490, the court sees no grounds to find that these PPQ officers should expect to provide an "extraordinary assurance of trustworthiness and probity" in the form of random urinalysis testing.

**14.** With respect to those PPQ officers cross-designated as Customs officers, the court notes evidence suggesting that even these officers do not perform the ordinary drug interdiction duties of a Customs officer. *See* Cordova Dec. ¶¶ 3–5, 9 (noting inconsistency and inadequacy

of training and that cross-designated PPQ officers do not have access to the Customs' Treasury Enforcement Communication System, a computer file containing identities of individuals and vehicles suspected to be involved in drug-related crimes). More important, as noted in this court's earlier opinion, the question of the responsibilities of Customs officers is not before this court. The government has failed to provide *any* information as to the specific responsibilities of these cross-designated employees. The court here expresses no opinion as to a decision by the *Customs Service* to test these cross designated officers based on their responsibilities as Customs officers. This court is simply unwilling to permit the government to use this generic classification, without any detailed information as to the duties of these cross-designated officers, to justify random urinalysis testing here.

security information that is the central focus of this governmental interest. *Lyng*, 706 F.Supp. at 946.

In *Harmon*, the D.C. Circuit confirmed this court's reasoning concerning the primary focus of this interest by noting that "whatever the precise scope of 'truly sensitive information,' it seems evident that top secret *national security materials* lie at its very core." *Id.* at 490 (emphasis added). As a result, the court there sustained the government's random urinalysis testing program of those employees with top secret security clearances.[15] In addition, the strength of this interest was enough to overcome the fact that the drug testing plan under consideration, "unlike the Customs program, involves *random* testing of employees who work in a traditional office environment." *Id.* (emphasis in original).

Noting, however, that the Supreme Court "gave indications that caution should be applied in approving this justification for testing," the D.C. Circuit rejected the argument that the government's compelling interest in protecting confidential information justified the random testing of all federal prosecutors or all Department of Justice employees with access to grand jury proceedings. *Harmon*, 878 F.2d at 492–93. The court reasoned that "whatever the precise contours of 'truly sensitive' information intended by the *Von Raab* Court, we believe that the term cannot include *all* information which is confidential or closed to the public view." *Id.* at 492 (emphasis in original).

This court concludes that the information at issue here is just that type of confidential information that cannot be made the subject of random urinalysis drug testing.[16] Thus, despite the arguably diminished privacy expectations of these computer operators,[17] this court reaffirms its earlier view "[t]he risks presented to the government, and to the public in general, from the damage or loss of some or all of this information is simply not the type of compelling risk that would justify" the random urinalysis testing proposed by the Department. *Lyng*, 706 F.Supp. at 946.[18] The court

15. *Id.* at 492. The court was careful to emphasize that "[t]op secret materials are of the highest order of confidentiality: this designation applies only to 'information, the unauthorized use of which reasonably could be expected to cause exceptionally grave damage to the *national security.*'" *Harmon*, at 491–92, n. 11 (emphasis added) (quoting Executive Order No. 12,356 which describes the various categories of classified information).

16. *See Harmon*, 878 F.2d at 496 (Silberman, J., concurring in part and dissenting in part) ("[W]ith regard to the government's interest in preserving confidentiality, it is hard for me to distinguish between a grand jury and, for instance, *the Department of Agriculture's annual crop estimates. . . .* Like the majority, I do not think the [Supreme] Court's conclusion that employees with access to truly 'sensitive information' can be tested permits testing . . . on these grounds.") (emphasis added). In addition, the two other factors recognized by the D.C. Circuit in *Harmon* provide additional support for the conclusion that the government interest here is not sufficiently compelling. The court finds that because this program involves *random* testing of employees who work within traditional office environments, the already less compelling interest in random testing is weakened further. The D.C. Circuit confirmed in *Harmon* that both these factors were *relevant* considerations in the balancing process. *Harmon*, 878 F.2d at 489; *see Cheney*, 884 F.2d at 614 (work in a more traditional office environment suggests "that drug use might be more easily detected").

17. The court acknowledges that because these computer operators submit to background investigations, these investigations "may be expected to diminish [the employees'] expectations of privacy in respect of a urinalysis test." *AFGE v. Skinner*, 885 F.2d at 892 (quoting *Von Raab*, 109 S.Ct. at 1397). The court notes first that the computer specialists here, unlike the motor vehicle operators under consideration in *AFGE v. Skinner*, do not have secret or top secret security clearances. Thus, the expectations of privacy of these computer operators are not as "severely reduced" as the comparable expectations of the motor vehicle operators considered in *AFGE v. Skinner*. Assuming without deciding that these employees do have a diminished expectation of privacy, for the reasons noted above, the court finds that the government's interest here is insufficient to overcome even diminished privacy expectations.

18. The court again notes that arguably the most compelling risk to the public, the risk of massive fraud, "cannot be perpetrated by the computer specialists at issue here without assistance." *Lyng*, 706 F.Supp. at 946 n. 42 (quoting the declaration of Carol Naughton, the Director of Information Resources Management at FNS). In addition, the government has again failed to "demonstrate that this particular risk is present only from drug use." *Id.*

therefore finds that the Department's proposed random urinalysis testing of these computer specialists is unreasonable under the Fourth Amendment.

### Motor Vehicle Operators

■ The government next argues that its interest in ensuring transportation safety justifies the random testing of the motor vehicle operators at issue here. Deft's Reply at 18. The defendants note that this interest is compelling because these positions are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* In further support of random testing, the government argues that these motor vehicle operators are among a category of public employees with a diminished expectation of privacy attaching to their physical condition "because successful performance of their duties depends uniquely on their judgment and dexterity." *Id.* at 16.

The defendants once again rely on favorable language from the Supreme Court, although the opinion of choice here is *Skinner*. *Skinner* sustained Federal Railroad Administration regulations that required railroads to test all covered employees following a "major train accident," which was defined to mean an accident that involved a fatality, a release of hazardous materials with either an evacuation or a serious injury, or damage to railroad property of $500,000 or more. 109 S.Ct. at 1408.[19]

In finding that the suspicionless, post-accident testing was reasonable under the Fourth Amendment, *Skinner* stated that the government's interest in protecting and preserving the public's safety was compelling because the "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 1419. Balanced against this compelling governmental interest were the privacy expectations of the covered employees, who "logic and

history showed" had "a diminished expectation of privacy" as to information relating to their physical condition and "the reasonable means of procuring such information." *Id.*

*Skinner* found that expectations of privacy were reduced by the employees' participation in an industry that had historically been "regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of the covered employees." *Id.* at 1418. The reason for the focus on the employees was also logical, according to the Court, because "an idle locomotive, sitting in the roundhouse, is harmless. It becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs." *Id.* at 1419.

In its supplemental memorandum, the government argues that the Court of Appeals for this circuit has established that "strong safety interests support the testing of … motor vehicle operators who are responsible, *inter alia,* for the transportation of visiting dignitaries and key Department officials and the operation of passenger-laden shuttle buses." *AFGE v. Skinner,* 885 F.2d at 892. The government also cites *American Federation of Government Employees ("AFGE") v. Cavazos,* 721 F.Supp. 1361 (D.D.C.1989) (upholding random testing of Department of Education motor vehicle operators).

The plaintiffs' opposition primarily attempts to distinguish *Skinner* both on the strength of the government's interest here and the relatively undiminished expectations of privacy of these motor vehicle operators. They argue that the government's interest here falls "far short" of the interest demonstrated in *Skinner* essentially because these drivers have "ordinary and run of the mill" safety responsibilities. Pltf's Supp.Mem. at 10. They urge the court to follow its ruling on the motion for a preliminary injunction and distinguish these drivers from mass transit workers

---

**19.** The regulations required that both blood and urine samples be taken from covered employees. *Skinner,* 109 S.Ct. at 1408. There was no requirement under this portion of the challenged regulations that a supervisor have any type of suspicion that a covered employee's acts contributed to the occurrence or severity of the accident. *Id.* at 1408–09.

and the like on the grounds that the gravity of the harm presented by these drivers is qualitatively lower. *Id.* (citing *Lyng*, 706 F.Supp. at 947 & n. 48).

The plaintiffs also point out that the privacy expectations of the motor vehicle operators are stronger than those in *Skinner* and *Von Raab* for two reasons. First, they note that the testing at issue here is random, not post-accident testing "where testing would occur in the context of a highly unusual circumstance when employee expectations of privacy are already reduced—a major train wreck," nor applicant testing "where applicants know at the outset that a drug test is a requirement of these positions."[20] Second, they argue that these operators are not employed in an industry that " 'is pervasively regulated' to protect safety, where the employees are a 'central focus' of the regulatory concern." *Id.* at 20. They again refer to this court's earlier finding "that no special license is required to operate any of the vehicles in question, nor does the USDA do any kind of a special background check or prescreening of these drivers" to support their argument that these employees do not have a diminished expectation of privacy. *Id.* at 21.

This Court finds that the D.C. Circuit's ruling in *AFGE v. Skinner* has established that "strong safety interests support the testing of most Department motor vehicle operators who are responsible for, *inter alia,* the transportation of visiting foreign dignitaries and key Department officials and the operation of passenger-laden shuttle buses." *AFGE v. Skinner,* 885 F.2d at 892. The circuit court went on to say, "[t]hus, obvious safety interests support the testing of the majority of the Department's motor vehicle operators." *Id.*

Upon further reflection, this court finds that the Circuit Court's ruling in *AFGE v. Skinner* compels it to dissolve its previously issued injunction as far as the motor vehicle operators are concerned and to uphold the random urinalysis testing of the motor vehicles operators in this case. The reasonableness of drug testing does not depend upon the number of passengers carried each day or that the drivers only operate buses on a back-up basis, but upon the potential gravity of the feared harm. Thus, although the potential danger posed by impaired back-up operators of passenger carrying motor vehicles would not be as enormous as presented in *Skinner,* it would be immediate as stated by the Court in *Harmon* and reiterated in *Cavazos.*

Therefore, this Court finds that the recent opinions of the Supreme Court, the United States Court of Appeals for the District of Columbia Circuit, and the U.S. District Court for the District of Columbia support the government's position insofar as the motor vehicle operators herein are concerned and that as aptly stated in the Government's corrected Supplemental Memorandum at 14 "... employees who must travel in USDA shuttle buses or automobiles in order to perform their essential duties, should not bear the risk that employees who may suffer from impaired perception and judgment ... will be behind the wheel in a position to cause catastrophic and irremediable harm."

## V

■ The plaintiffs have renewed their contention that the program's reasonable suspicion urinalysis testing provisions are unconstitutional. They argue here that the "government's interest in detecting on-duty drug use by employees who do not occupy safety related positions is not sufficiently compelling to justify departure from the probable cause standard, given the magnitude of the intrusion contemplated under the reasonable suspicion component of the plan." Pltf's Supp.Mem. at 25.

---

20. Pltf's Supp.Mem. at 15. The plaintiffs argue here that while the Supreme Court concluded that the lack of a demonstrated drug problem was not fatal to the Customs Department urinalysis testing program, "the Court did *not* conclude, that whether or not a drug problem has ever surfaced is irrelevant to determining the reasonableness of urinalysis testing under the Fourth Amendment." *Id.* at 12. They instead argue that the lack of a demonstrated drug problem should be an additional factor in assessing the strength of the government's interests when performing the balancing test required by *Skinner* and *Von Raab. Id.*

The court again must reject the plaintiffs' arguments. The Supreme Court essentially foreclosed this contention in *Von Raab* when it noted that "the probable-cause standard 'is peculiarly related to criminal investigations.' .... [and] may be unhelpful in analyzing the reasonableness of routine administrative functions...." 109 S.Ct. at 1391. The court notes again that the strength of the government's interest here is *considerably stronger* than the government's interest in *Von Raab* because the government does have *some* form of individualized suspicion before seeking to test any employee under this portion of the program.

While plaintiffs point to a number of differences in *Von Raab* and *Skinner* that arguably support a probable cause requirement, this court is of the view, in light of the quotations noted above, that the Supreme Court "has not encouraged the construction of such a theory." *See Harmon*, 878 F.2d at 489 (expressing a similar view concerning the random nature of a testing program).

The more difficult question before the court was raised by the defendants in a footnote and concerns this court's earlier decision to limit reasonable suspicion testing: "such testing shall be based on reasonable, articulable, and individualized suspicion that a specific employee may be under the influence of drugs while on duty." *Lyng*, 706 F.Supp. at 950. The defendants argue that:

"the Supreme Court's conclusion that off-duty employee drug use is of no [sic] legitimate concern to an employer, *Skinner*, slip op. at 25, *Von Raab*, slip op. at 16, does call into question this Court's limitation on reasonable suspicion testing to circumstances where there is evidence of an employee being under the influence on the job. (citing *Lyng*). It is reasonable to base testing on other objective circumstances, such as off-duty possession of drugs, an arrest or conviction for a drug offense, or evidence of tampering with a drug sample, *see* DPM Supp. 792–3 § 10–1(A)—because such information would tend 'to make the existence' of the fact of drug abuse 'more probable

or less probable than it would without the evidence.' "

Deft's Reply at 8 n. 2.

The question is not that such information makes drug abuse more or less probable, it is that such information makes impairment *on the job* more or less probable that presents the difficult question for the court. The court notes that one other judge in this district has specifically declined to impose an on-duty limitation to the proposed reasonable suspicion testing of all employees in the Department of Education. *AFGE v. Cavazos*, 721 F.Supp. at 1376–77 (finding that *Von Raab* and *Skinner* compelled the rejection of a request to limit testing to "individualized suspicion of on duty impairment"; permitting reasonable suspicion testing with identical triggering provisions as here to go forward).

The D.C. Circuit recognized that the Supreme Court has essentially eliminated any limitation on the government's interest to on-duty impairment in *Cheney*. There, the court reversed a ruling that the Department of the Army's proposed random urinalysis testing program was unreasonable under the Fourth Amendment because it lacked the "necessary nexus to the employer's safety concern [of on the job impairment]." *Cheney*, 884 F.2d at 607 (quoting *National Federation of Federal Employees ("NFFE") v. Carlucci*, 680 F.Supp. 416, 418 (D.D.C.1988)). The basis of the lower court's ruling was the government's admission that the current urinalysis testing technology did not measure on-the-job impairment. *NFFE v. Carlucci*, 680 F.Supp. at 418.

In reversing the lower court's rejection of random testing, the D.C. Circuit noted that while the Supreme Court had identified preventing on-the-job impairment as the compelling governmental interest in *Von Raab*, "the court did not even advert to the inability of the testing procedures to differentiate on- and off-duty drug use or impairment" when it sustained the applicant testing provisions at issue in the case. *Cheney* 884 F.2d at 609. "Rather," the D.C. Circuit continued, "[the Supreme

Court] referred only to the Service's broad responsibility to 'ensure against the creation of this dangerous risk,' a risk that urinalysis testing reasonably, albeit imperfectly, helped detect and prevent." *Id.* The D.C. Circuit concluded that the same analysis applied in *Cheney* and accordingly reversed the limitation of permissible testing to only those procedures capable of detecting on-duty impairment.

This court decides that this analysis applies here and requires that the limitation of suspected on-duty impairment be removed. Simply put, if the Supreme Court has sanctioned a testing procedure not strictly limited to testing for on-duty impairment, then it similarly would not limit reasonable suspicion testing to only those instances of verifiable on-duty impairment. Because each of the factors enumerated under the reasonable suspicion aspect of the program has a tendency to make the existence of on-duty impairment "more or less probable than it would be without the evidence," *Skinner,* 109 S.Ct. at 1421, the court concludes that its earlier limitation must be removed.[21]

## VI

■■■ This court further finds that the government's safety interest is sufficiently strong to justify the privacy intrusion represented by post-accident testing under the Fourth Amendment. Under the balancing test enumerated above, the court finds that the government's interests here are strong while the legitimate expectations of privacy of the USDA employees represented here are considerably weaker.

The government's interest in safety of both its employees and the general public is strengthened because, as noted by the Supreme Court in *Skinner,* post-accident testing will provide "invaluable information" in determining the cause of serious accidents and will permit the government to undertake "appropriate measures to safeguard the general public" and the employees themselves.[22] More importantly, as recognized by the D.C. Circuit in *Harmon,* the government's interest is stronger here than under random testing provisions because "[a]lthough post-accident testing requires no individualized suspicion, it at least requires concrete evidence that events have not gone as planned." *Harmon,* 878 F.2d at 488.

In addition, the court notes that the post-accident testing at issue here, unlike the mandatory testing at issue in *Skinner, see supra* note 19 (noting that there was no requirement that a covered employee either caused or added to the severity of an accident before testing could occur), does require that an individual *apparently cause* one of the triggering events before he or she can be required to provide a urinalysis sample. DPM Supp., at 18. The court finds that this requirement substantially reduces the legitimate expectations of pri-

---

**21.** This result is supported by the D.C. Circuit's recent action in *Jones v. Jenkins,* 878 F.2d 1476 (D.C.Cir.1989), the remanded version of the case discussed extensively in this court's first opinion, *Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir. 1987), *vacated and remanded,* —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989). The court had originally permitted suspicionless urinalysis testing in the context of regularly scheduled employment physicals only if the testing procedure could determine if the covered employees were intoxicated "while on school premises," i.e. on the job. 833 F.2d at 339–41. After the case was vacated by the Supreme Court after *Von Raab* and *Skinner,* the D.C. Circuit sustained testing procedures that could not only detect on the job impairment, holding that the testing program at issue "bears a close and substantial relation to the [Government's] goal of deterring drug use [ ]" on the job. *Jones v. Jenkins,* 878 F.2d at 1477. The court finds that a similar deterrence rationale justifies the elimination of its earlier restriction on "reasonable suspicion" testing.

**22.** *Skinner,* 109 S.Ct. at 1420. The Supreme Court recognized this increased strength of the government's interest in post-accident testing when it rejected the argument that impaired employees could be detected through a series of less drastic means: "while respondents posit that impaired employees might be detected without alcohol or drug testing, *the premise of respondents' lawsuit is that even the occurrence of a major calamity will not give rise to a suspicion of impairment with respect to any particular employee."* 109 S.Ct. at 1419 (emphasis added) (footnote omitted). This passage obviously implies that the Supreme Court believes that the government has a heightened interest (at least approaching the level of individualized suspicion) in post-accident testing.

vacy of the represented USDA employees because such a requirement, while not an *exact* substitute for particularized suspicion that an employee is impaired by drugs on duty, is an acceptably close one.

This finding on substitutability is supported by Supreme Court's opinions in both *Skinner* and *Von Raab*. In *Skinner*, the Court rejected the Ninth Circuit's view that urinalysis testing was unreasonable because it did not measure "current drug intoxication or degree of impairment" for several reasons. 109 S.Ct. at 1420. One of those reasons, according to the Court, was that a drug test "need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of the fact that is of consequence more or less probable than it would be without the evidence.' " *Id.* at 1421. The Court concluded that "[e]ven if urine tests disclosed nothing more specific than the recent use of controlled substances by a covered employee, this information would provide the basis for further investigative work designed to determine whether the employee used drugs at the relevant time." *Id.*

Here, the court finds that an accident of the severity described in the regulations, if coupled by reasonable and articulated grounds supporting the conclusion that an employee caused the accident, tends to make the question of on the job impairment (the fact of consequence here) more likely than not.

The court's finding on substitution is similarly appropriate in light of the Supreme Court's rejection of the contention in *Von Raab* that drug testing of Customs Service applicants was unreasonable because there was no showing that a drug problem existed in the Service. The Court dismissed this argument by essentially ruling that because "drug abuse is one of the most serious problems confronting our society today," there was no reason to believe that the Customs Service was "immune from this pervasive social problem." 109 S.Ct. at 1395.

Because there is no reason to believe that the Agriculture Department is immune "from this pervasive social problem," this court finds that it is reasonable to substitute an accident of the magnitude described in the program *apparently caused* by a USDA employee for particularized suspicion that the employee was impaired by drugs on the job. As a result, the court finds that the privacy expectations of the USDA employees represented here are significantly reduced.

While the employees here are "not the principal focus of regulatory concern" in the industry, at the same time, common sense suggests that they have a diminished expectation of privacy in their physical condition following the occurrence of one of the serious events described in the plan. Indeed, the plaintiffs' have conceded as much.[23] Accordingly, after the balancing the government's strong interest in employee and public safety against the diminished expectations of privacy of the represented USDA employees, the court finds that the Department's proposed post-accident testing is reasonable under the Fourth Amendment.[24]

## VII

The remaining portions of the plaintiffs' motion for summary judgment involve their challenge to the program's applicant testing provisions and their argument that the "disciplinary provisions of the USDA plan are legally inconsistent with the Civil

**23.** In attempting to distinguish the relative strength of the privacy interests involved in this case, the plaintiffs note that "[i]n *Skinner*, testing would occur in the context of a specific and highly unusual circumstance when employee expectations of privacy are already reduced—a major train wreck." Pltf's Supp.Brief at 15. For analytical purposes, while the Department's definition of an unsafe practice is, at least in some instances, less catastrophic, the same reduced expectation of privacy applies to workers after a triggering accident as described in the plan.

**24.** In the order that accompanies today's opinion, the court denies the plaintiffs' motion for a permanent injunction of the USDA's post-accident testing provisions, providing that a written statement indicating the specific grounds that any employee is suspected of having caused a triggering accident is prepared following any instance when such testing is ordered.

Service Reform Act of 1978 ("CSRA") and the Rehabilitation Act of 1973." Pltf's Mem. in Supp. at 16. The court will deal with these objections in turn.

■■■ The court finds that plaintiffs' do not have standing to challenge the program's internal applicant testing provisions. The court notes again that the only position subject to applicant testing considered here is that of motor vehicle operator. Plaintiffs have failed to demonstrate that any of their represented employees will be subject to internal applicant testing. While one of NTEU's members (and a current motor vehicle operator) has indicated that he will apply for the position of lead driver if it opens at some time in the future, Grayton Dec. at 1, (plaintiffs' exhibit twenty two), this hypothetical movement would not involve a promotion into a new position that would trigger applicant testing. Osborne Dec. ¶ 3 (movement into the lead driver position "would not be considered a new hire or promotion into a position requiring applicant testing"). The plaintiffs have accordingly failed to show that any of their represented employees will suffer actual injury from the internal applicant testing provisions.

■■■ The court notes that arguments identical to those made by the plaintiff under the CSRA have been rejected as premature in *AFGE v. Cavazos,* 721 F.2d at 1377. For the reasons expressed in *AFGE v. Cavazos,* the court finds that the plaintiffs' claims here must also fail. The court finds that this result is especially appropriate in light of the D.C. Circuit's decision in *Cheney* reversing the determination in *NFFE v. Carlucci* that because a positive urinalysis test result could not demonstrate "on the job impairment," random urinalysis testing was unreasonable under the Fourth Amendment. The Supreme Court has essentially expanded the scope of the acceptable "nexus" in the field of urinalysis testing. *See infra* section VI (discussing the Supreme Court's de facto expansion of the appropriate nexus to on-duty impairment).

A similar conclusion is also warranted for the plaintiffs' claims under the Rehabilitation Act of 1973. As noted by the court

in *National Treasury Employees Union v. Reagan,* 685 F.Supp. 1346, 1354 (E.D.La. 1988), while the plaintiffs have alleged that the rights of the represented employees under the Rehabilitation Act "will be violated by the disciplinary provisions" of the Department's plan, the plaintiffs have failed to allege which, if any of their members "would be considered 'handicapped' " under the Act. It is similarly impossible to determine at this stage whether any of the represented employees "would fit the definition of 'qualified handicapped persons' " under the Act. *Id.*

Accordingly, "it should surprise no one," including the plaintiff unions, that this court decides that "[s]hould a day arise when a handicapped individual within the protection of the Rehabilitation Act is disadvantaged by this program and presents a factual claim *in a concrete factual setting,* that will be soon enough to consider the effects of th[e] statute on the provisions of the testing program." *AFGE v. Skinner,* 885 F.2d at 897 (emphasis added). The court therefore finds that this claim is similarly not "significant." *Id.*

### VIII

For these reasons, the court grants in part the plaintiffs' motion for summary judgment and permanently enjoins the Department from randomly testing for drugs the PPQ officers and computer specialists represented here. The court, however, denies that portion of the plaintiffs' motion seeking a permanent injunction of the program's reasonable suspicion and post-accident testing provisions and grants the government's motion for summary judgment permitting the random testing of motor vehicle operators. An appropriate order accompanies this opinion.

### ORDER

Upon consideration of the plaintiffs' motion for summary judgment, the defendants' cross motion for summary judgment, the respective oppositions and replies filed by the parties, the entire record herein, and for the reasons set forth in the

accompanying memorandum opinion, it is by the court, this 18th day of January 1990,

ORDERED that the plaintiffs' motion for summary judgment is granted in part and denied in part; and it is further

ORDERED that the defendants' cross motion for summary judgment is granted in part and denied in part; and it is further

ORDERED that defendants are permanently enjoined from conducting proposed random urinalysis testing as set forth in the United States Department of Agriculture's Department Personnel Manual Supplement 792–3 ("DPM Supp. 792–3") for the testing of computer specialists and plant protection and quarantine officers; and it is further;

ORDERED that plaintiffs' motion for summary judgment seeking a permanent injunction of the defendants' proposed "reasonable suspicion" drug testing as set forth in DPM Supp. 792–3 is denied; and it is further

ORDERED that the plaintiffs' motion for summary judgment seeking a permanent injunction of the USDA's proposed post-accident or unsafe practice urinalysis testing is denied, provided that a written record is generated by every supervisor indicating the specific grounds that an employee is suspected of having caused a triggering accident following any instance when such testing is required; and it is further

ORDERED that the court's preliminary injunction enjoining the random testing of motor vehicle operators is dissolved and the defendants' motion for summary judgment on this issue is granted.