**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, Defendant.**

**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, Defendant.**

Civ. A. Nos. 88–3594, 90–0205.

United States District Court, District of Columbia.

March 2, 1990.

Order on Motion to Compel July 26, 1990.

295

Mark D. Roth, Gen. Counsel, Joe
Goldberg and Anne Wagner, Staff Counsel

American Federation of Government Employees, AFL–CIO, Washington, D.C., for American Federation of Government Employees.

Gregory O'Duden, Director of Litigation, Elaine Kaplan, Deputy Director of Litigation, National Treasury Employees Union, Washington, D.C., for National Treasury Employees Union.

Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Mary E. Goetten and Mary E. Magee, Civil Div., Federal Programs Branch, U.S. Dept. of Justice, Washington, D.C. (Barry F. Smith, Office of Gen. Counsel, Business and Administrative Law Div., Dept. of Health and Human Services, of counsel), for defendant.

## MEMORANDUM AND ORDER

HAROLD H. GREENE, District Judge.

On September 15, 1986 President Reagan issued Executive Order 12564[1] which requires federal agencies to develop and implement plans to attain a drug-free workplace, by, among other things, the use of compulsory drug testing of federal employees. Pursuant to this order, the Department of Health and Human Services (HHS) developed its "Drug-Free Workplace Plan," the implementation of which is now scheduled to begin on March 5, 1990. The actions before the Court challenge aspects of the HHS plan as unconstitutional.[2] Both the National Treasury Employees Union[3] and the American Federation of Government Employees[4] seek a preliminary injunction to enjoin the random testing of employees with security clearances, the random testing of motor vehicle operators, reasonable suspicion testing of all employees, and post-accident testing, on the grounds that all the proposed tests violate the Fourth Amendment of the Constitution.[5]

### I

### The Targeted Groups and Procedures for Drug Testing

The HHS plan provides for random drug testing of approximately 8500 employees

---

1. Reprinted in 51 Fed.Reg. 32889–32893 (Sept. 15, 1986).

2. Final regulations of the HHS plan were published on April 11, 1988 at 53 Fed.Reg. 11970. On December 14, 1988, the Secretary of Health and Human Services announced the issuance of a general 60–day notice of implementation of the plan, and two days later, the American Federation of Government Employees filed suit in this Court, seeking injunctive and declaratory relief as to certain aspects of the drug-testing plan. Thereafter, HHS apparently indicated that testing would not commence until a later date, but in November 1989, it began issuing 30–day notices to those employees targeted for random testing.

On November 29, 1989, the National Treasury Employees Union brought an action in the District Court for the Northern District of California also seeking declaratory and injunctive relief from the HHS drug testing program. NTEU at that time also moved for a preliminary injunction. Defendant moved to transfer the NTEU action to this Court, and this motion was granted. The Court also directed HHS to delay implementation of the plan until March 1, 1990. The NTEU action was thereafter consolidated with the AFGE action pending in this Court.

Given that certain discovery had yet to be completed and, that the government refused to delay implementation beyond the March 1, 1990 date, this Court established an accelerated briefing schedule to address only the question of a preliminary injunction. Pursuant to this schedule, AFGE filed a motion for a preliminary injunction, the government filed an opposition to that motion as well as to the preliminary injunction motion originally filed by NTEU in the Northern District of California, and NTEU filed a reply. HHS later extended the date of implementation to March 5, 1990.

3. The National Treasury Employees Union, as well as San Francisco Local Chapter 212 of the Union are plaintiffs in Civil Action No. 90–0205, and will collectively be referred to as NTEU.

4. The AFL–CIO, AFGE Local 3430 and Lawrence Johnson are also plaintiffs in Civil Action 88–3594, in addition to the national AFGE union; however, they will be collectively referred to as AFGE.

5. Plaintiffs do not challenge the three other types of testing under the plan, namely, applicant testing, voluntary testing, and testing as a follow-up to counseling.

AFGE additionally claims that the testing program violates the Civil Service Reform Act, 5 U.S.C. § 2302(b)(10). This claim, however, is without merit and will be dismissed. See AFGE v. Cavazos, 721 F.Supp. 1361, 1377 (D.D.C.1989); Nat'l Treasury Employees Union v. Reagan, 685 F.Supp. 1346, 1355 (E.D.La.1988); in accord, National Federation of Federal Employees v. Cheney, 742 F.Supp. 1 (D.D.C.1990).

occupying 45 different job categories [6] and that at least 10% of this group will be tested annually. AFGE motion at 6; Plan at 3. Many of the plaintiffs' bargaining units are targeted for random testing on the basis that they hold top secret security clearances [7] or occupy positions in the category of "Motor Vehicle Operator." [8] Plan at 31–33.[9]

The plan also provides for the drug testing of any HHS employee who engages in what are deemed to be "unsafe on-duty job-related activities," or who is involved in an "on-the-job-accident," if the accident or unsafe act results in a death or personal injury requiring immediate hospitalization or damage to government or private property in excess of $1000. Plan at 39.

Finally, the HHS plan permits drug testing of any employee who arouses the suspicions of a supervisor. Plan at 34. While "hunches" are not sufficient indicators to warrant testing, a reasonable suspicion may be founded on any of the following: (1) direct observation of the physical symptoms of being under the influence of a drug; (2) a pattern of abnormal conduct or erratic behavior; (3) status as an arrestee, convicted criminal, or target of a criminal investigation, for a drug-related offense; (4) information provided by reliable and credible sources or independently corroborated; and (5) newly discovered evidence that the employee has tampered with a previous drug test. *Id.*

The drug testing procedures involve the physical collection of urine samples without advance notice,[10] and with little, if any privacy. Employees are required to report to a collection site where a monitor will check the employee's identification, demand the removal of all unnecessary outer garments which could be used to tamper with the urine sample, and secure the toilet by placing bluing agents in the tank water and bowl and cutting off other water. The employee is then required to wash his or her hands, and is expected to urinate while the monitor takes note of any unusual behavior. For employees subject to reasonable suspicion testing, the monitor may not only listen to the urination of the employee, but also view it directly. When the monitor receives the urine sample, the employee must await permission to flush the toilet, and may be required to try again if the sample is not sufficient. If the inadequacy is in amount, the employee may be required to drink additional fluids and repeat the test; if the inadequacy is in the temperature of the urine, the employee must provide another sample under the eye of the monitor. The extracted samples are then tested for traces of cocaine and marijuana, and may be tested for substances such as opiates, amphetamines and phencyclidine.

The proposed drug testing plan is designed to serve the interest of HHS in eliminating illegal drug use from its workplace—an interest the Department describes as compelling because the Department is "the country's leader in drug abuse prevention, education, research and treatment." Plan at 2. In addition to this leadership role, the Department has articulated an interest in establishing a drug-free workplace which will assure the "highest

---

**6.** According to defendant, 9000 HHS employees in 80 job series will be subject to random testing. Opposition at 5. This discrepancy in figures may be accounted for by a revision, which AFGE claims was done, and had the effect of reducing the 80 positions identified in the original plan to 45 positions. *See* AFGE motion at 5–6 and note 10.

**7.** These include Management Analyst; Communications Specialist; Biological Sciences Group; Medical, Hospital, Dental and Public Health Group; and Security Specialist. AFGE motion at 6–7, and note 8; NTEU Reply, Exhibit 1.

**8.** In addition to positions as a motor vehicle operator this category encompasses positions as

"Program Assistant/Clerk" and those of "Building Representative." AFGE motion, n. 9.

**9.** In addition to employees in positions requiring top secret security clearances and those in motor vehicle operator positions, this group of 8500 also includes presidential appointment positions and law enforcement positions. Plaintiffs, however, do not represent employees in these latter two job categories.

**10.** For random testing the employee is to be notified the same day the test is scheduled, preferably within two hours of the test. Plan at 33.

degree of safety and trust," in carrying out the responsibilities of the agency, which include:

protecting the Department's multi-billion dollar financial management responsibility from fraud, waste, and abuse; ensuring the integrity of biological and medical research dealing with contagious and communicable disease; ensuring the safety of foods, drugs, and medical devices used by the public; ensuring the accurate, timely, and uninterrupted delivery of benefits and services to elderly and disabled citizens; and the protection of public health and safety. Plan at 2–3.

In short, the intended purpose of the plan is "to offer assistance to those who need it, while sending a clear message that illegal drug use is incompatible with federal service." *Id.* at 2.

## II

### *The Standard for Preliminary Injunctive Relief*

In deciding the merits of a motion for preliminary injunctive relief, four factors must be considered: (1) the likelihood that plaintiffs will succeed on the merits; (2) the threat of irreparable harm to plaintiffs if injunctive relief is not granted; (3) the possibility that defendants and others will suffer substantial harm if injunctive relief is issued; and (4) the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977). In addition, where the injury factors favor injunctive relief, preliminary relief may be granted even if the case only raises a serious legal question going to the merits. *Population Institute v. McPherson,* 797 F.2d 1062, 1078 (D.C. Cir.1986).

■ There can be no doubt that plaintiffs will suffer irreparable injury if the proposed drug-testing plan is implemented in violation of their constitutional rights.

*Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The nature of the injury is especially substantial in a case like this where the government action will result in the supervision and coercion of one of the most basic and private practices of humankind. As described above, employees may be forced to urinate for testing with as little as two hours notice. In addition, an employee subject to reasonable suspicion testing is automatically a candidate for direct observation of his or her urination. Such direct supervision is triggered for all employees by such uncontrollable things as improper urine temperature. In addition, any employee who does not produce a sufficient amount of urine on demand must be detained, forced to drink more fluids, and required to urinate again. Moreover, the consequences for refusal to urinate on demand are severe. According to the plan, "an employee who refuses to be tested when so required will be subject to the full range of disciplinary action, including dismissal." Plan, Section VIII.E., p. 29.

Against these intrusions into the most private aspects of human functions, the Court must weigh the harm to the Department of Health and Human Services which would result in a delay of the plan's implementation. This Court cannot quarrel with the merits of an executive branch desire to create a drug-free workplace for federal employees. It can, however, question the need for immediate of implementation of the plan, given that its effectiveness has been delayed over forty-one months since President Reagan issued the authorizing Executive Order. Against the intended purpose of the plan—to send "a clear message that illegal drug use is incompatible with federal service," Plan at 2, through the threat of urinalysis, the Court must weigh the potential infringement on the constitutional rights of the plaintiffs.[11]

**11.** As indicated in an earlier case on drug testing involving the Department of the Interior, the Court takes note of the fact that threatening loyal federal employees with drug testing is not the only way to convey a message about drug use. *See Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989). Given that "HHS is largely a so-cial service agency," Opposition at 4, it is unlikely that its employees regularly handle classified information, or that its employees are engaged in dangerous transportation or armed endeavors—two types of job-related activity for which courts have recognized the government's interest in drug-testing. This apparent diminished

The Court must also consider the public interest in careful evaluation and protection of fundamental constitutional interests.

### III

### Random Testing of Employees With Top–Secret Security Clearances

■ Plaintiffs acknowledge the recent holding of the Court of Appeals for this Circuit that employees who hold top secret national security clearances may be subjected to random urinalysis regardless of whether or not they have regular access to top secret information. *Harmon v. Thornburgh*, 878 F.2d 484, 492 (D.C.Cir.1989). At the same time, however, they urge the Court to make a distinction between employees for whom the need for access to highly classified information is actually contemplated, and employees who do not need a top secret clearance at all. According to NTEU, many employees occupy non-sensitive positions but must maintain a security clearance only due to the HHS "emergency preparedness program." Reply at 16. Plaintiff NTEU further argues that the fact that some employees have never had access to classified information, together with the fact that HHS has recently decided to conduct a review of all top secret security clearances, raises "substantial questions concerning the validity of HHS' practices with respect to granting top secret security clearances." Reply at 17. NTEU requests that a preliminary injunction be granted with respect to the random testing of these employees until certain outstanding interrogatories and requests for production of documents put to the Department regarding these practices are answered, and summary judgment proceedings are completed. Reply at 17–18.

However, the Court is bound by the analysis in the *Harmon* case, and it therefore declines to hold that this drug testing program raises a serious legal question going to the merits. In *Harmon*, the Court assumed that under the Supreme Court decision in *National Treasury Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), submission to drug testing could be required for employees with access to top secret material, and it concluded that the government's interest in protecting top secret information outweighed the employees' privacy interest. On the basis of that decision, the Court rejects plaintiffs' claim for relief from random drug testing of HHS employees possessing top secret security clearances.

### IV

### Random Testing of Motor Vehicle Operators

■ The government argues that it has a compelling interest in ensuring the safety of the motor vehicle operators at HHS who carry passengers and packages, and that this justifies random testing of the employees in this job category. Plaintiffs contend that the motor vehicle operators do not pose an extraordinary risk to others, in contrast to other safety-related jobs for which courts have sustained random drug testing, and that most of the drivers do not hold security clearances, another interest for which courts have upheld random drug testing. NTEU Reply at 6–7.

When infringement on Fourth Amendment rights "serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Harmon*, 878 F.2d at 488; quoting *Von Raab*, 109 S.Ct. at 1390; in accord *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 1413–1413, 103 L.Ed.2d 639 (1989). On the basis of this balancing test, the Court must determine whether the random testing of the motor vehicle operators constitutes an unreasonable search.

need for drug testing in these respects, together with the policy statement of the Department itself, indicates that this plan may have been designed more for show and rhetoric than for a genuine concern about the problem of drug abuse. *See Bangert, id.* at 651, 654.

There is no question but that there are substantial safety interests in testing motor vehicle operators, regardless of whether they transport passengers or act as package couriers.[12] In fact, two recent decisions of judges of this Court have upheld the random testing of motor vehicle operators with identical responsibilities to the employees at issue here. *American Federation of Government Employees v. Cavazos*, 721 F.Supp. 1361, 1373 (D.D.C.1989) (upholding random testing of Department of Education motor vehicle operators responsible for transporting passengers, packages and mail); *National Treasury Employees Union v. Yeutter*, 733 F.Supp. 403, 412–415 (D.D.C.1990) (upholding the random testing of Department of Agriculture motor vehicle operators responsible for driving shuttle buses and other vehicles).

Plaintiffs argue that the safety interests at stake here are not of the same magnitude as the safety interests for which the Court of Appeals and the Supreme Court have sustained drug testing programs. *See Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (train wrecks); *AFGE v. Skinner*, 885 F.2d 884, 891 (D.C. Cir.1989) (hazardous materials); *National Treasury Employees Union v. Von Raab*, 109 S.Ct. 1384, and *National Federation of Federal Employees v. Cheney*, 884 F.2d

603 (D.C.Cir.1989) (employees carrying firearms); *Jones v. Jenkins*, 878 F.2d 1476 (D.C.Cir.1989) (busloads of handicapped children). Plaintiffs also contend that the government's interest in testing these motor vehicle operators does not differ significantly from its interest in testing drivers who are not federal employees,[13] and that, if this safety concern were regarded as an acceptable rationale for drug-testing federal employees, it could easily be extended to ordinary citizens, and random drug testing could become a requirement of holding a driver's license. NTEU Motion at 21; Reply at 8–9.

Although these arguments are not without merit, this Court declines to strike down the random testing of motor vehicle operators as unreasonable. In *Harmon v. Thornburgh*, the Court of Appeals emphasized that "[t]he public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat" (emphasis in the original). 878 F.2d 484 (D.C.Cir. 1989). It is this aspect of *Harmon* that compelled the District Court in *AFGE v. Cavazos* to uphold the random testing of motor vehicle operators. 721 F.Supp. at 1373. The immediacy of a threat of severe injury is present in the operation of a motor vehicle, regardless of the number of passengers carried, or the fact that no passengers are carried at all. *See NTEU v. Yeutter*, 733 F.Supp. at 414. Moreover,

---

**12.** Among the motor vehicle operators to be tested in the HHS program are the following: MVO, Browning, Montana, who provides daily transportation for Indian patients from the Blackfeet Indian Reservation to and from physicians, dentists and hospitals around Montana as well as transportation of emergency patients; MVO/Warehouse Worker, Research Triangle Park, North Carolina, who operates vehicles with a gross weight of 31,000 pounds and capable of carrying loads in excess of four tons, and makes round trips to the National Institutes of Health in Bethesda, Maryland, a distance of 530 miles; MVO, Chinle, Arizona, who operates pickup trucks, carryalls, sedans, ambulances, and station wagons to transport patients, personnel and/or supplies to and from hospitals, airports and other locations; MVO, Baltimore, Maryland, who operates large trucks, up to and including seven and one-half ton capacity and up to 45–passenger bus for the transportation of personnel, supplies, and equipment in the Baltimore–Washington area; MVO, Chicago, Illinois,

who operates trucks and vans weighing from 7,000 to 22,000 pounds capable of carrying loads of one to four tons; MVO, Washington, D.C. who operates motor vehicles with gross weight of 7,000 to 22,000 pounds, provides driving services to the Assistant Secretary for Family Support and other high-level officials, and provides courier services for such officials. Declaration of Thomas McFee, Assistant Secretary for Personnel Administration of HHS, Defendant's Exhibit A, pp. 14–17.

**13.** According to the government, motor vehicle operators "are expected to be skillful drivers, able to operate these vehicles in all types of weather, in all types of traffic patterns and for long periods of time ... [s]kill is also required since these employees must be prepared to act quickly to avoid unforeseen dangers, such as failure of brakes or sudden actions by pedestrians of Obstacles [sic] in the path of the vehicle." Opposition at 12.

given the safety-related nature of their work, motor vehicle operators may have some diminished expectations of privacy.

At the same time, however, the likelihood of the injury, as well as its magnitude, are not irrelevant inquiries. There are apparently some employees classified as motor vehicle operators whose primary function is not the operation of a vehicle, but the receipt and sorting of mail. *See* NTEU Reply at 8. Based on the current record, the Court cannot determine which, if any, job categories involve relatively little driving. However, given that the Court in *AFGE v. Skinner* upheld the random testing of mail van operators with secret and top secret security clearances only on the basis of their access to classified information, rather than any safety risks which the mail van operators may have posed to their environment, plaintiffs may be entitled to an injunction with respect to employees classified as motor vehicle operators who drive very infrequently and without passengers. *See AFGE v. Skinner*, 885 F.2d at 892–893.

■ In this respect it is also worth noting that in sustaining the random drug testing of certain motor vehicle operators, Federal Railroad Administration hazardous material inspectors, and Federal Aviation Administration aircraft mechanics, the Court of Appeals in *AFGE* stressed the "extraordinary safety sensitivity of the bulk of the covered positions," which was amply supported by the record. *AFGE v. Skinner*, 885 F.2d at 890; *see also, Transportation Institute v. United States Coast Guard*, 727 F.Supp. 648, 657 (D.D.C.1989). While the immediacy of the potential harm may be a crucial factor in assessing the legitimacy of the government's interest in safety, the magnitude of the injury, as well as the likelihood of its occurrence cannot be entirely ignored in a Fourth Amendment inquiry.

While the Court will not grant a preliminary injunction with respect to the motor vehicles as a class, it still has an interest having the parties narrow the categories, if possible, in order to remove from random testing any employees who are in job categories which involve little driving. For similar reasons, the Court in *NFFE v. Cheney*, 884 F.2d 603 (D.C.Cir.1989), remanded the case to the District Court in order to develop a more complete factual record to determine who of the many employees in "chemical and nuclear surety positions," actually were "responsible for the custody, transportation, storage, maintenance, demilitarization, and security of surety material," *id.* at 611. Likewise, in *Hartness v. Bush*, Civil Action No. 89–0044, 1990 WL52967 (D.D.C. January 26, 1990), the Court lifted a preliminary injunction with respect to the random drug testing of certain Executive Office employees with top secret security clearances, but allowed discovery to proceed regarding "the criteria the government relied upon to select positions to be tested (including positions with top secret clearances) and whether application of those factors to the particular persons to be tested was reasonable." *Id.*, slip. op. at 4. Since most of the individuals listed as motor vehicle operators will legitimately be subject to random testing, the Court will deny the request for a preliminary injunction at this stage. However, the parties will be expected to address this issue in their summary judgment filings.

## V

### Post–Accident Testing

■ Plaintiffs challenge the post-accident testing plan as overbroad because it is not limited to employees who are engaged in safety-sensitive or accident-prone occupations, and is therefore unreasonable; because it does not require that the employee have "apparently caused," the accident; and because as little as $1,000 in property damage can trigger the test. NTEU Reply at 22–23. Indeed, the language of the post-accident testing program would apply equally to a clerk who slips and breaks an expensive piece of fragile equipment at work, as to a train mechanic whose accident may injure many people.

The government argues that the Supreme Court's decision in *Skinner* validates this aspect of the HHS plan. Opposition at 42. However, that case does not support the broad testing proposed by

HHS. In that case, the Supreme Court upheld a drug testing program whereby railroad employees were subject to urine and blood test after major train accidents as well as incidents involving fatalities, when a reasonable suspicion existed that an employee's conduct contributed to the accident, or when certain specified rules had been violated. 109 S.Ct. at 1408–1409. In reaching this decision, the Court relied heavily on the fact that the employees were involved in "safety-sensitive tasks." The Court found that the government had a special need to ensure the safety of the traveling public and of the employees themselves; that this government interest would be significantly hindered if a showing of individualized suspicion was a prerequisite to testing; and that the railroad employees at issue had a diminished expectation of privacy by virtue of their employment in a pervasively regulated industry. *Id.* at 1414–1418, 1421. Given all these factors, the Court concluded that the employees' miminal privacy interests where outweighed by the government's interest in preventing "risks of injury to others that ... can have disastrous consequences," *id.* at 1419, 1421.

In light of the Supreme Court's emphasis on safety-sensitive positions, it may be that the current formulation of the HHS post-accident testing plan could not withstand constitutional scrutiny. The government's interest in securing a safe workplace is certainly important, but the testing of any employee for any accident resulting in as little as $1,000 of damage, when the employee is not engaged in a safety-sensitive position, when there is no indication that the employee was at fault, and when the employee may not have engaged in any conduct which would diminish his or her expectations of privacy, is simply too invasive for the government's stated purpose. In that respect the HHS program is in sharp contrast to the post-accident program accident testing plan at the Department of Agriculture recently sustained in *NTEU v. Yeutter,* 733 F.Supp. 403 (D.D.C. 1990). That plan required two factors not present here: (1) that an individual apparently caused the triggering event; and (2)

the magnitude of property damage was at least $10,000. Based on these two factors the Court concluded that "it is reasonable to substitute an accident of the magnitude described in the program *apparently caused* by a USDA employee for particularized suspicion that the employee was impaired by drugs on the job" (emphasis in original). 733 F.Supp. at 417.

The government argues that certain HHS employees do, in fact, have a direct impact on the public safety, and it cites the example of those employees who are in regular contact with infectious contagions and diseases. Opposition at 45. Application of the Plan to this group may indeed withstand scrutiny under the balancing of interests required by a Fourth Amendment inquiry, as well as under the Supreme Court's decision in *Skinner, id.* However, it is not the task of the Court to propose subcategories which might meet constitutional standards; rather, the burden is on the agency "to redefine a new category of employees," who may legitimately be subject to this kind of testing. *Harmon v. Thornburgh,* 878 F.2d 484, 491 n. 10 (D.C. Cir.1989). Such narrower categories may be proposed in the summary judgment process. However, at this point, the Court will grant plaintiffs' motion for a preliminary injunction with respect to post-accident drug testing.

## VI

### *Reasonable Suspicion Testing of All Employees*

■ The government asserts a compelling interest in testing employees for illegal drugs in order to maintain the integrity of its workforce and to ensure that its employees perform their duties properly when those duties have a direct impact on the public safety. Opposition at 38. In order to secure this interest, the HHS plan allows for "reasonable suspicion testing," which can be triggered by any one of the following five criteria: (1) Observable phenomena, such as direct observation of drug use or possession and/or the physical symptoms of being under the influence of a

drug; (2) A pattern of abnormal conduct or erratic behavior; (3) Arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use, or trafficking; (4) Information provided either by reliable and credible sources or independently corroborated; or (5) Newly discovered evidence that the employee has tampered with a previous drug test. Plan, Section X. A. at 34. On the basis of any of these criteria, an employee is automatically considered a person who the collection personnel "have reason to believe ... may alter or substitute the specimen to be provided" and therefore can be required to produce urine under the direct observation of a collection monitor. Plan, Section XIII. B., p. 41.

While the government's asserted interest in maintaining the integrity of its workforce and in securing safety-sensitive positions is important, it is equally important that the testing criteria be tailored to this interest, and do not subject employees to any unwarranted infringement of Fourth Amendment rights. As currently formulated, the HHS criteria for reasonable suspicion testing are not so limited.

First. The proposed criteria are not limited to observation of or information regarding on-the-job impairment. As this Court recently held, any decision to sustain criteria which apply to off-duty activities, as well as on-duty impairment, on the theory that the government has an interest in both, would fly in the face of the careful balancing of interests required by Fourth Amendment jurisprudence and Supreme Court precedent. *National Federation of Federal Employees v. Cheney*, 742 F.Supp. 1 (D.D.C.1990); *see also, Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989).

That is not to say that the urinalysis testing procedure is itself constitutionally defective because it cannot distinguish between on-duty and off-duty drug usage—a contention rejected by the Court of Appeals in *NFFE v. Cheney,* 884 F.2d 603, 609 (D.C.Cir.1989). Rather, in formulating the criteria which can trigger a urinalysis test, the government must articulate a specific compelling interest in policing off-duty drug usage which has an impact on an employee's on-duty job performance before the Court can weigh these interests against the employee's privacy expectations.

In both *Skinner* and *Von Raab,* the Supreme Court engaged in a careful evaluation of the government's compelling interests, in the avoidance of disastrous accidents in the former case, and in ensuring that Customs agents did not place themselves at risk of bribery or injure others with the weapons they carried in the latter case, and weighed these interests against the privacy expectations of the employees. In both cases the Supreme Court found the interests of the employees to be diminished due to the nature of the employment. In *Von Raab,* the Court made it clear that the privacy expectations of employees in certain types of public service may be diminished due to the type of employment, but that these situations were unique and "[u]nlike most private citizens or government employees in general." *Von Raab,* 109 S.Ct. at 1394. Moreover, in addressing the question of off-duty drug use of certain customs agents, the Supreme Court was careful to emphasize that the unique mission of the U.S. Customs Service "creates a compelling interest in ensuring that many of these [agents] do not use drugs even off-duty, for such use creates risks of bribery and blackmail against which the government is entitled to guard." *Von Raab,* 109 S.Ct. at 1395.

Unlike the special interest in ensuring off-duty drug use in the *Von Raab* case, HHS has not articulated any special circumstances with respect to the employees in their Department which would justify the use of criteria which apply to off-the-job drug usage that does not affect on-the-job duties. It is unlikely that a generalized interest in securing the integrity of the HHS workforce by policing their off-duty drug could survive a Fourth Amendment challenge. As stated in this Court's decision in *Cheney,* if this were the case, the government would have an equally legitimate interest in testing the illegal drug

usage by any member of society. *NFFE v. Cheney*, 742 F.Supp. at 3.

A more specific government interest in applying testing criteria to off-duty activities could be sustained if it were limited to the kind of concern articulated by the Supreme Court in *Von Raab*. However, until such an interest is articulated by the government and addressed by the Court, plaintiffs are entitled to a preliminary injunction preventing the application of the first four criteria, where those criteria are triggered by off-duty activities, rather than on-the-job behavior.

■ Second. The standard which provides for reasonable suspicion testing based upon "a pattern of abnormal conduct or erratic behavior," is both unduly broad and ambiguous. It is unclear, for example, how this standard would be applied to employees who do not exhibit "the physical symptoms of being under the influence of a drug," as required by the first criterion. Certainly, "the pattern of abnormal conduct or erratic behavior" must be the kind of erratic behavior that could be induced by drugs in order to justify a urinalysis test; otherwise, there would be no reasonable suspicion that the behavior was induced by drug use. In addition, for a supervisor to make such a determination, he or she would surely have to be trained to recognize the types of emotional behavior that are the result of drug-use. Yet, even with these precautions, it appears that there is likely to be a risk of error in evaluating who should be tested under this relatively subjective criterion, than in use of the far more objective criterion which calls for testing based on direct observation of the physical symptoms of drug use.[14] The fact that this standard has not been limited to behavior on the job will only aggravate this feeling, for not only can an employee be watched at work, but his activities and behavior at home can also be reviewed under this section regardless of its impact on his work.

The Court will grant plaintiffs' motion for a preliminary injunction with respect to this standard on the ground that it is overbroad and not sufficiently related to the government's interest. The parties may make suggestions for tailoring this criterion to the government's asserted interest in preventing on-the job drug use.

■ Third. The third criterion for testing is also problematic. According to the government, "reasonable suspicion testing ... is premised upon an individualized suspicion of illegal drug use directed at a particular employee." Opposition at 37. Yet, within this category of testing, the government proposes to test a class of persons on the basis of their status as a convicted criminals, arrestees, or objects of a criminal investigation regarding a drug-related offense.

The government argues that "conviction of a drug-related offense ... certainly shows that an employee has used illegal drugs in the past and is more *likely* to use drugs at work than an employee who has not been convicted." Opposition at 40. The government goes on to claim that because the Supreme Court approved post-accident testing of employees who were merely in the vicinity of a train accident in *Skinner*, no particularized suspicion is required of those who are convicted of a drug-related crime. *Id.* However, the government's reference to Skinner is misplaced. The testing sustained in *Skinner* was triggered by a specific event—namely an accident—and the testing was performed in order to assist in the investigation of the accident. No such safety interests are asserted by the government.

Moreover, the drug testing proposed by HHS does not specify a triggering event. The criterion is not limited to employees who have recently been arrested for a drug-related crime. Instead, the criterion applies to any HHS employee who has *ever been* arrested or convicted for a drug-related crime. Consequently, an employee who was arrested for or convicted of possession

---

**14.** The fact that the first standard refers to "the physical symptoms of being under the influence of a drug," indicates that there is an objective set of observable phenomenon such as dilation of the pupils, rapid heart rate, slurred speech, etc., which can be applied.

of marijuana decades ago could suddenly be required to undergo drug testing regardless of whether or not there is any evidence of current or recent drug use. There also appears to be no limit to the number of times the employees in this category could be tested. For example, if an employee with an arrest or conviction takes a urinalysis test next month and passes, he could, under the current criterion, be tested again and again on the theory that once he had been involved in drugs, he is always a likely drug user.

Yet employees who voluntarily come forward to reveal their drug use are not subject to this criterion, nor are employees who have previously used drugs but were never arrested. Consequently this criterion appears to be directed more at punishing people for past criminal conduct than at deterring or detecting current drug use. The government has not claimed to have this kind of punitive interest, nor is it clear that implementing this kind of punishment is a role the executive branch is entitled to play. *See United States v. Stephaney Roberts*, 726 F.Supp. 1359 (D.D.C.1989). In any event, the criterion as presently drafted is not directed at detecting current drug use, the government's asserted interest, and it is therefore unreasonable under the Fourth Amendment.

 Fourth. NTEU argues that standard number five which provides for reasonable suspicion testing based upon "newly discovered evidence that the employee has tampered with a previous drug test," is unreasonable because it does not create a suspicion that the employee uses illegal drugs on-duty. Reply at 21. The Court rejects this claim and finds that such evidence does constitute individualized, reasonable suspicion that an employee uses illegal drugs on-duty and that it is not unreasonable for the government to administer another drug test based upon such evidence.

 Fifth. Under the program, employees subject to reasonable suspicion testing can be required to provide their urine samples under direct visual observation, simply by virtue of the fact that they are being tested pursuant to this program, rather than on the basis of some evidence that they have tampered with a sample in the past. Despite the fact that direct visual observation makes the testing qualitatively different and more invasive, the government has not articulated any compelling need for this additional protection against adulteration of the urine sample beyond the measures already provided. As it stands the plan already provides more than adequate protection against adulteration by requiring monitors (1) to ensure that employees remove all clothing which could be used to hide a urine sample, (2) to listen for unusual behavior; (3) to add bluing agents to the toilet water; (4) to prevent the employee from flushing; and (5) to check the temperature of the urine sample.

In upholding the drug testing of certain Customs agents, the Supreme Court was careful to note that there was "no direct observation of the act of urination, as the employee may provide a specimen in the privacy of a stall." *Von Raab*, 109 S.Ct. at 1394 n. 2. Similarly, in upholding the drug testing of rail crews, the Supreme Court credited the regulations in their effort to reduce the intrusiveness of the collection process by not requiring that the samples be furnished under direct observation. *Skinner*, 109 S.Ct. at 1418. Given that the government has not asserted a compelling interest in this additional protection against adulteration, nor has it cited any authority for the proposition that such direct visual observation is legitimate in the context of reasonable suspicion testing where there has been no evidence of an attempt to tamper with the urine sample, plaintiffs' request for a preliminary injunction with respect thereto shall be granted.

Accordingly, it is this 2nd day of March, 1990

ORDERED that the motion for a preliminary injunction with respect to the random testing of employees with top secret security clearances be and it is hereby denied; and it is further

ORDERED that the motion for a preliminary injunction with respect to the random

testing of motor vehicle operators be and it is hereby denied; and it is further

ORDERED that the motion for a preliminary injunction with respect to post-accident testing be and it is hereby granted; and it is further

ORDERED that the motion for a preliminary injunction with respect to reasonable suspicion testing be and it is hereby granted in part and denied in part; and it is further

ORDERED that the claim under the Civil Service Reform Act be and it is hereby dismissed.

## MEMORANDUM ORDER

## ON MOTION TO COMPEL

 In this drug testing case, the plaintiffs have served discovery requests on the Department of Health and Human Services (HHS) regarding the Department's security clearance practices. The government has largely refused to provide the information sought, and a motion to compel was filed which, together with the government's opposition, is now before the Court.

On March 2, 1990, the Court issued a comprehensive Opinion on drug testing at HHS, in which it held, *inter alia*, that there was no basis for a preliminary injunction against the random testing of HHS employees who hold top-secret national security clearances. In further pursuit of their effort to halt such testing, plaintiffs now seek detailed information concerning such matters as HHS internal procedures for the issuance of security clearances; the procedures utilized to classify information as top-secret security information. Included under these broad categories are more detailed requests, such as one for "the specific reason the employee is required to maintain a top-secret security clearance and now the clearances relates to the [employee's] job duties"; another for the criteria utilized in issuing top-secret security clearances; still another for the identification of all documents generated in relation to the request for and the grant of top-secret security clearances for HHS employees; and still another for the nature of the top-secret information to which cleared employees have access. The requests are not well taken.

First. The Supreme Court has held that the issuance of security clearances issued under Executive Order 12,356 is an exercise of the Executive's authority in national security affairs with respect to which the judiciary normally has no jurisdiction. *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); *see also, Skees v. Department of the Navy*, 864 F.2d 1576 (Fed.Cir.1989).

Second. It may well be that *Egan* allows for exceptions where the need for judicial involvement is great and where articulable suspicion is present that the classification of employees with respect to access to top-secret information is designed for such unlawful purposes as the denial of constitutional or other legal rights or the violation of court orders or laws duly enacted by the Congress. But in the instant case, plaintiffs' request for information is not much more than a fishing expedition. It is unlikely that HHS is classifying employees as being entitled to access to highly sensitive information solely to enable the Department to subject them to urine testing. The Court would have to have far more convincing evidence than plaintiffs have submitted before it will allow them to receive the kinds of highly classified and sensitive information they seek.

Third. In *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), the Court of Appeals for this Circuit held that the drug testing of government employees who hold top-secret security clearances is permissible even where the employee may not have regular access to such information. *See also, National Federation of Federal Employees v. Cheney*, 742 F.Supp. 1 (D.D.C. 1990) (Greene, J.). In fact, as the *Harmon* court noted, the "whole point of granting top-secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top-secret materials as soon as the need arises." 878 F.2d at 492.

Fourth. The relevancy of the information being sought by plaintiffs, and the

likelihood that it will lead to the discovery of admissible evidence are so slight that the Court would not be justified in requiring the government to produce that information in view of the enormous quantitative and qualitative burdens this would impose upon the government. *See* Rule 26(b)(1), Fed.R.Civ.P.; *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Freeman v. Seligson,* 405 F.2d 1326, 1335 (D.C.Cir.1968).

For the reasons stated, the motion to compel is denied.