James L. PLANE, and All Other Similarly Situated Employees of the Defense Logistics Agency Located at Battle Creek, MI, Local 1626 American Federation of Government Employees, and All Other Similarly Situated Employees of the Defense Logistics Agency Located at Battle Creek, MI, and Al Digennaro, and All Other Similarly Situated Employees of the Defense Logistics Agency Located at Battle Creek, MI, Plaintiffs,

v.

UNITED STATES of America, Defense Logistics Agency, Defense Logistics Service Center, Richard Cheney, Secretary to the Department of Defense, and George M. Koburnus, Colonel, United States Air Force Commanding Officer, Defendants.

No. 1:90–CV–300.

United States District Court, W.D. Michigan.

Oct. 31, 1990.

Steven Z. Cohen, Cohen & Ellias, Birmingham, Mich., Joe Goldberg, Asst. Gen. Counsel, American Federation of Government Employees, AFL–CIO, General Counsels Office, Washington, D.C., for plaintiffs.

Agnes M. Kempker–Cloyd, U.S. Asst. Atty., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Theodore R. Pixley, Jr., Defense Reutilization & Marketing Service, Battle Creek, Mich., Stuart M. Gerson, Mary E. Goetten, Mary E. Magee, U.S. Dept. of Justice, Civil Division, Federal

Programs Branch, Washington, D.C., for defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction. Plaintiffs, the American Federation of Government Employees, AFL–CIO, ("AFGE") and its affiliates, on behalf of all AFGE bargaining unit civilian employees in the Defense Logistics Agency ("DLA"), seek an agency-wide injunction of random urinalysis drug testing. They also seek to enjoin implementation of the DLA "reasonable suspicion" and "post accident" testing programs. Plaintiffs' motion, accompanied by an over-length brief of 42 pages, was filed in this Court on October 22, 1990, one week before the testing was scheduled to begin. On an expedited briefing schedule, defendants filed their response brief, also lengthy, at noon on October 25. The Court held a hearing on the motion on the last working day available before the scheduled testing, Friday, October 26. Plaintiffs offered the testimony of two witnesses, Mr. Thomas Dmoch, an environmental protection specialist with the DLA, and Mr. Alfred Digennaro, President of the Union. At that hearing, defendants offered, and the Court ordered, that testing not begin before November 8, 1990, in order to allow the Court time in which to make a reasoned response to plaintiffs' motion.

## BACKGROUND

The DLA is the component of the Department of Defense responsible for providing services and supplies used by all branches of the military. DLA employees acquire and furnish repair parts, food, fuel, medical supplies and clothing for American soldiers. It also administers contracts for such diverse items as missiles, explosives, textiles, electronic equipment, aircraft and tanks.

Pursuant to Executive Order 12564,[1] and in light of public safety and national security concerns, the DLA promulgated its Drug–Free Workplace Plan ("DLA Plan"). The DLA Plan was developed in accordance with section 503 of the Supplemental Appropriations Act of 1987, 5 U.S.C. § 7301 *note*, and was certified to Congress on April 27, 1988.

The DLA Plan provides for random drug testing only of employees in certain "sensitive positions" (Testing Designated Position: "TDPs"). The DLA Plan originally identified five factors to consider in identifying TDPs. The purpose was to limit TDPs to those positions having job functions directly and immediately relating to public health and safety, the protection of life and property, law enforcement, or national security. The Plan provided a preliminary list of 16 different job series whose positions would be TDPs, with an estimated 1,050 employees in these positions. The right to add or delete TDPs was specifically reserved to the Director of the DLA. On September 1, 1989, approval was requested, and subsequently received, to add all positions with access to secret or top secret information. The current TDPs list now includes positions with access to secret and top secret information, environmental protection specialists who work directly with hazardous wastes, security specialists, firefighters, guards and police, nurses, general and criminal investigators, and transportation/mobile equipment operators.

The DLA Plan provides for testing to be conducted in accordance with the testing, privacy and chain of custody requirements set forth in the Department of Health and Human Services' "Mandatory Guidelines for Federal Workplace Drug Testing Programs," issued by HHS pursuant to § 4(d) of Executive Order 12564. The procedure

1. Executive Order 12564 directs that the head of each executive agency "establish a program to test for the use of illegal drugs by employees in sensitive positions." 51 Fed.Reg. 180, § 3(a) (September 17, 1986) (Plfs.' Ex. A). Under the Executive Order, employees in "sensitive positions" include those whose duties "involve law enforcement, national security, the protection of life and property, public health or safety or other functions requiring a high degree of trust and confidence." *Id.* § 7(d)(e).

provides that an employee may be required to report to a collection site which has been "secured" by a collection site monitor by placing bluing agents in the toilet tanks and bowl water. Upon arrival, the employee will be asked for identification and to remove any unnecessary outer garments. The employee will be asked to wash her hands, after which the monitor must make sure the employee has no access to any water supply, soap or cleaning agents. The employee may provide her specimen in the privacy of a stall, with the monitor listening for any unusual behavior. After receiving the sample, the monitor will check it for sufficient volume and temperature. The collection site monitor will keep the sample in view at all times, and must execute chain of custody forms upon receipt of the specimen.

The Plan authorizes testing for the presence of five drug metabolites: marijuana, cocaine, opiates, phencyclidine and amphetamines. However, initial testing at the DLA will be conducted to detect only the presence of marijuana and cocaine metabolites.

## STANDARD

*Preliminary Injunction Standard*

In deciding whether to grant or deny a preliminary injunction, the Court must balance four well-known factors. These factors are:

1. Whether the plaintiff has shown a strong or substantial likelihood of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

The purpose of the preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Preliminary injunctions are addressed to the discretion of the district court. *Synanon Foundation, Inc. v. California,* 444 U.S. 1307, 100 S.Ct. 496, 62 L.Ed.2d 454 (1979). This type of relief is an extraordinary remedy best used sparingly. *Roghan v. Block,* 590 F.Supp. 150 (W.D.Mich.1984).

■ The Sixth Circuit has cautioned courts that they should not view the four factors as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir.1985). Thus, a court can enter a preliminary injunction if it finds that the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir. 1982). "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff [,however], the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985). Also, as the strength of showing as to irreparable harm increases, the necessity to show likelihood of success on the merits decreases. *Ardister v. Mansour,* 627 F.Supp. 641, 644 (W.D.Mich. 1986). Yet in spite of the overall flexibility of the test for preliminary injunctive relief, the Sixth Circuit has stated that irreparable harm element is to be analyzed carefully. In *Friendship Materials, Inc. v. Michigan Brick, Inc.,* the court said:

Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required [a showing of] irreparable harm before an interlocutory injunction may be issued.

679 F.2d 100, 103 (6th Cir.1982).

## DISCUSSION

The leading authorities on employee drug testing are *Skinner v. Railway Labor Ex-*

*ecutives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In *Skinner,* the Supreme Court upheld Federal Railroad Administration ("FRA") regulations authorizing drug testing of employees without warrants or individualized suspicion when the employees were involved in train accidents or violated certain safety rules. While finding that mandatory urinalysis testing did constitute a search under the fourth amendment, the court stressed the important governmental interest at stake in monitoring railroad employees who are engaged in "safety-sensitive" tasks and whose duties are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," and held that the government interest justified the "privacy intrusions" even absent a warrant or individualized suspicion. *Skinner,* 489 U.S. at ——, 109 S.Ct. at 1415, 1419, 103 L.Ed.2d at 662, 667. The court also found that railroad employees had a diminished expectation of privacy respecting information pertaining to their fitness.

In *Von Raab,* a case decided on the same day as *Skinner,* the court upheld urinalysis testing on United States Customs Service employees who sought transfer or promotion to positions which directly involved the interdiction of illegal drugs or required the carrying of a firearm. Again the court employed a balancing test and supported the government's need to conduct warrantless and suspicionless searches of employees engaged directly in drug interdiction or otherwise required to carry a firearm. The court also noted "that certain forms of public employment may diminish privacy expectations." *Von Raab,* 489 U.S. at ——, 109 S.Ct. at 1393, 103 L.Ed.2d at 706.

Although readily agreeing that "the government has a compelling interest in protecting truly sensitive information" and that employees seeking jobs where they would handle "classified information" could be required to submit to a urine test, the *Von Raab* court remanded the question of whether testing of employees required to "handle classified material" was reasonable, because the court questioned whether the category of employees who fell under this classification was defined more broadly than necessary to meet the purposes of the drug testing directive.[2] *Von Raab* also outlined testing procedures comporting with HHS guidelines and identical or substantially similar to those in the case before me, and voiced no objection to the procedures. *Von Raab,* at ——, 109 S.Ct. at 1388–1389, 103 L.Ed.2d 699–700.

Recently, the Sixth Circuit also recognized that mandatory urinalysis testing conducted pursuant to state action does constitute a search under the fourth amendment. In *Penny v. Kennedy,* 915 F.2d 106, (6th Cir.1990) (en banc) the court considered challenges to the constitutionality of proposed mandatory urinalysis of the City of Chattanooga's fire fighters and police officers without reasonable cause or suspicion to believe that the employees were using controlled substances. The appeals court recognized that the city of Chattanooga had a compelling interest in ensuring that its fire fighters and police officers perform their duties free of any risk of impairment from the use of illegal drugs. The court vacated district court decisions entering injunctions prohibiting wholesale drug testing, but declined to rule on the constitutionality of the drug testing plan, because it was unable to discern the reasonableness of the city's testing procedures. Finding that the record before it contained no "standards for the frequency, purpose, or methods of conducting the tests," *id.* at 1068, the court remanded the case, for "further proceedings ... consistent with the Supreme Court's decision in *Von Raab* and *Skinner.*" *Id.* at 1068.

In the case at hand, defendants do not dispute that mandatory urinalysis is a

---

**2.** Included in this category were such diverse positions as "Accountant," "Accounting Technician," "Animal Caretaker," "Attorney (all)," "Baggage Clerk," "Coop Student (all)," "Electric Equipment Repairer," "Mail Clerk/Assistant," and "Messenger." *Von Raab,* 489 U.S. at ——, 109 S.Ct. at 1397, 103 L.Ed.2d at 710.

search under the fourth amendment, and correctly note that the inquiry into whether a search is unreasonable under the fourth amendment "depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner*, 489 U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661, quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). The reasonableness of a particular search practice "is judged by balancing its intrusion of the individual's fourth amendment interests against its promotion of legitimate governmental interests." *Montoya*, 473 U.S. at 537, 105 S.Ct. at 3308. In *Von Raab* and *Skinner*, the Court "reaffirm[ed] the longstanding principle that neither a warrant nor probable cause, nor indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Von Raab*, 489 U.S. at ——, 109 S.Ct. at 1390–1391, 103 L.Ed.2d at 702; *Skinner*, 489 U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. The court established a balancing test to evaluate the constitutionality of drug testing. It stated that a court must:

> balance[ ] the public interest in the ... testing program against the privacy concerns implicated by the tests, without reference to [the] usual presumption in favor of the procedures specified in the Warrant Clause, to assess whether the tests required ... are reasonable.

*Von Raab*, 489 U.S. at ——, 109 S.Ct. at 1397, 103 L.Ed.2d at 710.

Despite this clear direction from the Supreme Court, plaintiffs, in their brief supporting their motion, did not argue a position by position analysis of the drug testing at issue, or engage in a position by position balancing test, and consequently their brief is of little assistance to the Court. At the hearing, plaintiffs acknowledged this omission and structured their oral argument accordingly. Defendants presented their arguments in their brief in opposition and at the hearing on a position by position basis. As required, I will address plaintiffs' allegations on a position by position basis.

## I. RANDOM DRUG TESTING

*Top Secret and Secret Security Clearances*

At oral argument, plaintiffs conceded that in light of the Supreme Court's holding in *Von Raab* and subsequent cases, their request to enjoin random drug testing of employees with top secret security clearance does not have a likelihood of success on the merits and must be denied. *See also Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989); *AFGE v. Sullivan*, 744 F.Supp. 294 (D.D.C.1990); *AFGE v. Cheney*, Civ. No. 88–3823, 89–4112, 89–4443 (N.D.Cal. March 15, 1990); *AFGE v. Cavazos*, 721 F.Supp. 1361 (D.D.C.1989).

■ Plaintiffs assert, however, that the random testing of employees who possess only secret security clearances is not warranted. In support of their argument, plaintiffs cite *Hartness v. Bush*, 751 F.Supp. 1 (D.D.C.1990). In *Hartness*, the district court of the District of Columbia vacated its preliminary injunction with respect to the random testing of White House employees with top secret clearances, leaving intact its prohibition against random testing of White House employees with secret clearances. The D.C. Circuit denied defendant's motion for summary reversal of the district court's decision with respect to secret clearances and ordered an expedited appeal. It appears that this matter has been argued to the D.C. Circuit and awaits decision. This is the only case brought to the Court's attention, or which the Court itself has located, in which such a distinction was made between secret and top secret clearances. A number of other cases have held that employees with either secret or top secret security clearances could be subject to random drug testing. *AFGE v. Skinner*, 885 F.2d 884 (D.C.Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990) (*"Skinner D.C."*); *NFFE v. Cheney*, 742 F.Supp. 1 (D.D.C.1990).

At oral argument, plaintiffs' counsel argued that a distinction should be made

between those employees who have secret security clearances and those employees who actually handle documents classified as secret. Counsel argued that many employees who have secret clearance do not, in fact, handle documents classified as secret on a daily basis, and such clearance is necessary only in case of an emergency such as a declaration of war or a national disaster. In *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), the court declined a similar invitation from plaintiff, stating:

> It would not be desirable to ask the Department of Justice to draw a distinction between ... attorneys who do and those who do not deal with such [top secret] materials on a regular basis. The whole point of granting top secret security clearances in advance is to provide flexibility to ensure that employees can be given access to top secret materials as soon as the need arises.

*Id.* at 492.

Like the *Harmon* court, I do not think plaintiffs' argument on distinguishing between those employees who actually use secret documents on a day to day basis versus those who would only have access in case of an emergency is persuasive.

Defendants argue that employees who possess secret security clearances have a lessened expectation of privacy by virtue of the extensive background investigation such employees must undergo in order to receive their secret security clearance. Defendants assert that in order to receive a secret security clearance a candidate must successfully complete a full field background investigation, including finger print and name checks with other law enforcement agencies, a review of education, employment, tax, and financial records, and interviews with friends, neighbors and supervisors.

In performing the balancing test outlined in the recent Supreme Court cases, I am convinced that the government has shown a compelling interest in protecting secret information. I am also not unmindful of the argument that employees with secret security classifications have a lessened expectation of privacy. Accordingly, I believe plaintiffs have failed to show a strong likelihood of success on the merits on their claim to enjoin testing of employees with secret security clearances, and will deny their motion.

### Positions Affecting the Public Safety

Plaintiffs also request that the Court enjoin the random testing of DLA employees in law enforcement positions, environmental protection specialists, fire fighters, nurses and transportation and mobile equipment operators.

### Law Enforcement Positions

DLA personnel subject to mandatory testing in this category include investigators, criminal investigators, police, guards, and detectives. At oral argument, and upon review of the position descriptions filed by defendants on the day of oral argument, it became clear to the Court that while detectives, police officers and guards are required to carry firearms in the course of performing their duties, investigators and criminal investigators are not required to carry guns, but are only required to have knowledge in the "use of handguns and shoulder-fired weapons." Defendants' Exhibit H at 2. The Court believes this is an important distinction because in *Von Raab*, the court approved testing of persons applying for a position in which they would carry a firearm, noting:

> The public interest[ ] demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm.... Customs employees who may use deadly force plainly discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.

*Von Raab*, 489 U.S. at ——, 109 S.Ct. at 1393, 103 L.Ed.2d at 705 (internal cites omitted). The court also concluded that because of the danger posed by use of weapons, employees who carry them "should expect effective inquiry into their fitness and probity...." at ——, 109 S.Ct. at 1394, 103 L.Ed.2d at 706.

In the recent Sixth Circuit opinion in *Penny*, the court found that individualized suspicion of illegal drug use is not

required prior to subjecting a police officer to mandatory random urinalysis testing. *Penny*, at 1067. A number of other courts have upheld random testing of employees who carry firearms. *NFFE v. Cheney*, 884 F.2d 603, 612 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990) (civilian Department of Defense police and guards); *Guiney v. Roache*, 873 F.2d 1557, 1558 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 404, 107 L.Ed.2d 370 (1989) (municipal police officers); *NFGE Local 1533 v. Cheney*, Civ. A. Nos. C88–3823, C89–412, C89–4443 (N.D.Cal.1990) at 30–31 (Navy guards with firearms). Whether the employee has ever actually used his or her weapon has no bearing on this analysis; the simple fact that no such harm has occurred in the past does not preclude testing. *AFGE v. Cavazos*, 721 F.Supp. at 1372 (Department of Education armed guard). Accordingly, as to police officers, guards and detectives, all of whom are required to carry a firearm in performance of their duties, plaintiffs have failed to show a likelihood of success on the merits and preliminary injunction is denied.

■ As to investigators and criminal investigators, I am unpersuaded that random drug testing is warranted. While it may be true, as defendants assert, that investigators and criminal investigators "function in situations which are 'dynamic and evolving'", Brief at 14, this factor does not persuade the Court that the government's interest in drug testing these employees is so highly compelling as to outweigh their fourth amendment protections. Without proof that these employees carry firearms, which the Court does not have before it, I believe that random drug testing is unwarranted and that plaintiffs have a likelihood of success on the merits. Furthermore, I believe that the harm to plaintiffs if injunctive relief is denied is larger than the harm to defendants in granting the relief. Finally, I believe the public interest lies in upholding constitutional guarantees of privacy. Accordingly, I will grant preliminary injunctive relief as to investigators and criminal investigators.

*Firefighters*

The DLA Plan calls for the testing of firefighters. A further review of the position descriptions provided by defendants reveal that three jobs, firefighter, fire protection specialist, and fire protection inspector, are included in this category. *See* Defendants' Exs. M, N, O. Defendants represent in their brief that employees in all three positions are required to drive pumper trucks to a fire or other emergency and, once at the scene, to determine the most efficacious way to extinguish a blaze. Defendants also represent that these employees may be called upon to render emergency medical services or respond to hazardous waste spills. Brief at 18.

■ A review of defendants' position descriptions confirms that firefighters are routinely called upon to drive pumper trucks and extinguish blazes, and that fire protection specialists may be called upon to do so in the event of a serious fire or other serious incident. However, the job description for fire protection inspector which defendants have submitted to the Court contains no mention of any driving or other emergency type duties. Rather, it provides that the inspector will organize and administer fire prevention and protection activities, perform fire prevention inspections, install and maintain fire extinguishers and similar type duties. Defendants' Ex. O. From the description provided, it appears that the fire protection inspector jobs are not the type that are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 489 U.S. at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667. Defendants do not argue, nor do I believe, that fire protection inspector employees have a diminished expectation of privacy. Additionally, I am convinced that the harm to plaintiffs in denying injunctive relief to employees who are fire protection specialists would be greater than the harm to defendants in granting such relief. I am also convinced that the public interest lies in protecting fourth amendment rights. Accordingly, as to fire protection inspec-

tors, I will grant plaintiffs' request for a preliminary injunction.

■ As to firefighters and fire protection specialists, I note that the Sixth Circuit's decision in *Penny* specifically addressed the mandatory testing of firefighters, finding that individualized suspicion of drug use is not necessary prior to requiring these employees to submit to urinalysis testing. It is obvious that the duties of firefighters are such that the governmental interest in having them perform free from the influence of illegal drugs is compelling. Certainly their duties *are* fraught with the risk of injury to themselves and others. In *Skinner, D.C.*, the D.C. Circuit approved the random testing of firefighters without discussion specific to firefighters duties. 885 F.2d 884. Plaintiffs in *Skinner* challenged the random testing of all Category I employees of the Department of Transportation. This included some 30,000 employees in a multitude of various jobs, including firefighters. Plaintiffs singled out, and specifically challenged, three positions: motor vehicle operators; FRA hazardous material inspectors; and FAA aircraft mechanics, as representative positions. *Skinner, D.C.*, 885 F.2d at 891. The court specifically discussed these three positions; however, it also upheld the testing of the entire Category, stating "the record amply evidences the extraordinary safety sensitivity of the bulk of the covered positions." *Id.* at 890.

Considering all these factors, I am persuaded that defendants have shown a compelling interest in assuring that firefighters and fire protection specialists perform their duties free from the influence of illegal drugs. Accordingly, I believe plaintiffs have failed to show a strong likelihood of success on the merits and their motion for a preliminary injunction as to firefighters and fire protection specialists will be denied.

*Nurses*

■ The DLA Plan provides for random testing of nurses, asserting that nurses must be able to "react swiftly in emergency situations," and that nurses may be required to take resuscitative measures in case of cardiac arrest when a physician is not present. The Plan also notes that nurses' access to medication requires the utmost integrity. DLA Plan, "Nurse, GS–610," unnumbered page. The job description for nurses which defendants submitted provides that a nurse assists the Command Medical Officer in administering a program of occupational health for the Federal Center in Battle Creek, Michigan. He or she also administers emergency treatment for injuries and illnesses occurring on the job, performs limited portions of physical examinations, administers medications, develops and presents health education programs and other health programs such as blood drives, maintains health unit files, and assists with safety and health inspections. Defendants' Ex. L. The description provides that a nurse must be able to distinguish between types of serious injuries and illnesses, advise and assist employees with physical, emotional or mental problems including making appropriate referrals, and operate specialized medical equipment such as an EKG machine. *Id.* The only case law cited to the court in support of the DLA's Plan to randomly test nurses is *Skinner, D.C.*, 885 F.2d 884. And, as discussed above, nurses were not one of the three "test" positions singled out by plaintiffs for close scrutiny. In fact, the court, in a footnote, merely noted that nurses were a Category I employee and later affirmed the testing of all Category I employees without attempting to specifically perform for nurses the balancing test outlined in *Skinner* and *Von Raab*.

In performing the balancing test, I am persuaded that the government has a compelling interest in assuring that nurses are free from the effects of illegal drugs in the performance of their duties. While not all aspects of a nurses's job might require such alertness, it is clear that certain portions do. Specifically, I note that nurses dispense medications, which always requires alertness and diligence, and particularly so if given in the form of an injection. DLA employees should not be made to bear the risk that a nurse administering their medication would be using anything less

than clean, sterile needles. Further, nurses may be called upon to administer cardiopulmonary resuscitation, obviously something which requires one to be free from the influence of illegal drugs. I also find that it is reasonable to expect that someone who has chosen a profession such as nursing, where life and death situations can arise, has a lesser expectation of privacy in their ability to provide the services necessary to perform their duties. Accordingly I find that plaintiffs have not shown a likelihood of success on the merits in their request for a preliminary injunction as it applies to nurses, and I will deny their request.

*Environmental Protection Specialists*

 The DLA Plan also calls for the random testing of environmental protection specialists. In their brief, defendants describe the duties of an environmental protection specialist as including the inspection, containment and disposal of hazardous materials. These employees must ensure that hazardous materials are properly and safely labeled, identified and stored. Environmental protection specialists also serve as emergency spill coordinators at DLA facilities and are responsible for the prevention, control and cleanup of accidental spills of toxic materials and vapors. Brief at 18.

At the hearing, however, the Court heard the testimony of Thomas Dmoch, an environmental specialist employed at the DLA office in Battle Creek, Michigan. Mr. Dmoch testified that he does not handle hazardous materials of any kind and that his duties involved investigating outside contractors who are hired by the DLA to dispose of toxic wastes. His job appeared to the Court to be an office-based job, with plenty of paperwork. He testified that there are environmental protection specialists who do handle toxic substances, whom he referred to as "field personnel." In addition, plaintiffs submitted into evidence three job descriptions for positions bearing the title of environmental protection specialist. The titles of these positions are identical, "Environmental Specialist GS–028–12." However, a review of these documents reveals that two of the descriptions describe jobs that involve no handling of toxic waste. Plaintiffs' Ex. 4, 5. The third description provides that the employee shall "administer the proper labeling, packing and disposal of hazardous substances" and that "personal protection equipment ... may be required to limit ... exposure to conditions in or adjacent to the hazardous waste site." Plaintiffs' Ex. 3. The Court is uncertain whether this indicates that an employee in this position would actually be handling hazardous waste or would merely be exposed to such substances. Further, the Court is unclear as to what distinguishes these jobs, in title at least, from each other.

To make matters more confusing, defendants have also submitted a position description for Environmental Protection Specialist GS–028–12. This description is longer than those submitted by plaintiffs and more detailed. It provides that an environmental protection specialist's duties include, among other things, control of hazardous substances and on-site coordination of all emergency response measures. Defendants' Ex. P. However, much of the job description includes tasks such as drafting response plans, monitoring programs and inspections, and conducting surveys. Again, the Court is uncertain whether this means that an environmental protection specialist in the position described by this job description would actually be handling hazardous materials.

The Court believes that it is not required to sort out the defendant's system of categorizing its environmental protection specialists. The DLA Plan submitted by defendants, clearly states that "[t]esting designated positions include only those environmental protection specialists who work directly with hazardous wastes, as described below." DLA Plan, unnumbered page. The plan provides the following description:

Incumbent serves as activity focal point for hazardous property and arranges for the disposal of hazardous wastes. Incumbent inspects hazardous products to insure proper identification, labeling and containment. Incumbent determines

whether containers are safe to handle and inspects for leaks. Incumbent serves as emergency spill coordinator at the work site, with responsibility for the prevention, control, and cleanup of pollution caused by spills, leaks, vapors, and waste disposal. Position consequently requires vigilance, alertness and attention to detail to identify all potential hazards and to react immediately, appropriately and safely to leaks which may occur at any time.

In *Skinner, D.C.,* FRA hazardous material inspectors were one of the categories of employees singled out as a test category by the plaintiffs. The D.C. Circuit upheld the testing of Department of Transportation employees responsible for hazardous waste inspections, finding that the duties of such employees were "intimately related to the prevention of public harm" and that the public should not have to bear the risk that "employees who may suffer from impaired perception and judgment" occupy such positions. *Id.* 885 F.2d at 891. *Cf. International Brotherhood of Electrical Workers v. Skinner,* 913 F.2d 1454 (9th Cir.1990) (Drug testing of employees engaged in natural gas, liquefied natural gas, and hazardous liquid pipeline operations operations upheld as a reasonable measure properly geared to public safety needs).

Applying the balancing test, I am convinced that a distinction between those environmental protection specialists who routinely handle or inspect hazardous wastes as a part of their job, and those who do not is a necessary distinction. As to those employees who handle or inspect hazardous waste materials as part of their job duties, and those employees whose job descriptions specifically require that they serve as first line emergency spill coordinators, plaintiffs have not shown a likelihood of success on the merits and thus the injunction is denied. As to those employees who do not inspect or handle hazardous wastes, and who will not routinely be called upon to coordinate spill responses, the injunction will be granted. I do not believe that these latter employees serve in positions "fraught with danger", nor do I believe that they have a diminished expectation of privacy. The fact that they might someday, in the event of a spill of catastrophic proportions, be called on to assist in a response, is simply not enough to convince me that they should undergo this "privacy intrusion." Someday we might all be called upon to assist in responding to a catastrophic accident, and I think this chance does not strip us of our fourth amendment protection. I am simply not convinced that these are employees who "discharge duties fraught with such risk of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 109 S.Ct. at 1419.

*Transportation/Mobile Equipment Operators*

The DLA Plan also calls for the random testing of motor vehicle operators, fork lift operators, tractor operators, road sweeper operators, engineering equipment operators, crane operators, brake-switching and conducting personnel and locomotive operators. I believe, and plaintiffs conceded at the hearing, that the Supreme Court's holding in *Skinner* requires a finding that plaintiffs' injunction as to brake switching and conducting personnel and locomotive operators must be denied.

Defendants argue that drug testing of motor vehicle operators is necessary because they "will come into contact with other drivers and pedestrians and are, therefore, in a position 'where even a momentary lapse of attention' could result in harm." *Amer. Fed. of Gov. Employees v. Cavazos,* 721 F.Supp. 1361 (D.D.C.1989). In *Cavazos,* the district court of D.C. upheld drug testing for nine Department of Education drivers, finding that the drivers "would come into direct contact with other drivers and pedestrians and are therefore in a position where 'even a momentary lapse of attention' could result in harm." *Id.* at 1373, quoting *Skinner,* 489 U.S. at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667. The court stated, however, that it based its holding not solely on *Skinner* and *Von Raab,* but largely on the finding in the D.C. Circuit case of *Harmon,* 878 F.2d 484, which upheld drug testing for Department

of Justice employees with top secret security clearances, but did not address motor vehicle operators. *Harmon* focused, not on the magnitude of the harm, but, on the immediacy of the threat. Later cases in the district court of D.C. have upheld random testing of Department of Agriculture and Department of Health and Human Services motor vehicle operators, again focusing on the immediacy of a threat of severe injury. *National Treasury Employees Union v. Yeutter*, 733 F.Supp. 403 (D.D.C. 1990) (dissolving a preliminary injunction entered before the *Von Raab, Skinner* and *Skinner, D.C.* decisions that enjoined testing of Department of Agriculture motor vehicle operators); *AFGE v. Sullivan*, 744 F.Supp. 294 (D.D.C.1990). In *Sullivan*, the court did express its interest in having the parties narrow the categories to remove from random testing any employees whose jobs involved little driving. The district court for the Northern District of California has also approved testing of navy civilians employed as motor vehicle operators and locomotive engineers, finding that these positions have regular duties in which a single lapse may cause serious injury or death. *AFGE Local 1533 v. Cheney*, C88–3823, C89–4112, C89–4443 (N.D. Ca.1990) at 34.

However, in *National Treasury Employees Union v. Watkins*, 722 F.Supp. 766 (D.D.C.1989), the D.C. District Court granted a preliminary injunction against random drug testing of Department of Energy employees classified as motor vehicle operators stating:

> We believe that the safety risks involved with motor vehicle operators carrying out their duties are no greater than the normal risks associated with vehicle use by the general public.... Defendant has not demonstrated that these employees pose the imminent risk of 'disastrous consequences' that supported the government's interest in *Skinner* and *Von Raab*.

*Id.* at 769 (internal cites omitted). This is the only case brought to the Court's attention to reach this conclusion.

Defendants argue that heavy machinery operators pose just as severe a threat to the public safety as do motor vehicle operators. For instance, Engineering Equipment Operators are required to operate a bulldozer and forklift with a capacity to lift 10,000 pounds and must operate a oxyacetylene torch to cut scrap material. Job Description, Defendants' Ex. Q. Fork Lift Operators drive machinery weighing 103,-000 pounds with a 50,000 pound capacity. Job Description, Defendants' Ex. R.

In applying the balancing test, I am persuaded that defendants have shown a compelling need to test motor vehicle operators and heavy machinery operators. It is clear that these employees perform tasks in which a single lapse may cause serious injury or death. Clearly, alertness and diligence are required of all drivers. And, I am convinced that an employee who accepts a job "fraught with such dangers" has a lessened expectation of privacy as to his or her ability to perform his or her job requirements free from the influence of illegal drugs. Accordingly, I believe plaintiffs do not have a likelihood of success on the merits, and I will deny their request for a preliminary injunction.

CONCLUSION

As to employees with secret and top secret security clearances, detectives, police officers, guards, firefighters, fire protection specialists, nurses, environmental protection specialists who routinely handle or inspect hazardous wastes or who serve as first line emergency spill coordinators, motor vehicle operators, heavy equipment operators, brake-switching and conducting personnel and locomotive operators, I am convinced that plaintiffs have failed to meet their burden of showing a likelihood of success on the merits. I am also convinced that a balancing of the harm should an injunction issue in this matter weighs heavily in favor of the defendants and the public. Accordingly, plaintiffs' motion for injunctive relief as to these classes of employees is denied. As to investigators, criminal investigators, fire protection inspectors, environmental protection specialists who do not inspect or handle hazardous

wastes and do not act as first line spill coordinators, I am convinced that plaintiffs have shown a likelihood of success on the merits, irreparable harm and likelihood of harm should their request be denied. Accordingly, I will grant their motion for injunctive relief as to these employees.

## II. REASONABLE SUSPICION TESTING

 Plaintiffs have also requested a preliminary injunction enjoining DLA from implementing the "reasonable suspicion" testing of employees. The DLA has submitted a Declaration from Anthony Hudson, Staff Director of the Office of Civilian Personnel of the DLA, in which he states that reasonable suspicion testing will not begin until some time in 1991. Hudson Dec. ¶ 27. Accordingly, as plaintiffs admitted at the hearing, they stand to suffer no immediate irreparable injury with respect to this portion of the DLA Plan, and their request for injunctive relief is denied.

## III. ACCIDENT OR UNSAFE PRACTICE TESTING

 Plaintiffs also seek to enjoin the DLA from implementing the Accident or Unsafe Practice Testing portion of the Plan. This portion of the Plan provides that:

A. Testing shall be required of all employees involved in Class A, B, or C mishaps.

B. Based on the circumstances of the accident or unsafe act, an employee's supervisor may initiate testing for employees involved in Class D mishaps or in unsafe acts which do not result in a mishap, but which pose an immediate and severe threat to health or safety of DLA employees or the public in general, or an immediate and severe threat to national security.[3]

Mishaps are defined as follows:

*Class A Mishap:* The resulting total cost of property damage and personnel inju-ries is $500,000 or greater; or a DoD aircraft is destroyed; or an injury/occupational illness results in a fatality or permanent total disability.

*Class B Mishap:* The resulting total cost of property damage or personnel injuries is $100,000 or more, but less than $500,-000, or an injury/occupational illness results in permanent partial disability or hospitalization of five or more personnel.

*Class C Mishap:* The resulting total cost of property damage or personnel injuries is $10,000 or more, but less than $100,-000, or an injury/occupational illness results in a lost workday case involving days away from work.

*Class D Mishap:* The resulting total cost of property damage or personnel injuries is less than $10,000, or an injury/occupational illness resulted in a lost workday case involving days of restricted work activity or a nonfatal case without lost workdays.

Plaintiffs seek to enjoin this testing, claiming that unlike the plan approved in *Skinner*, the DLA Plan creates extremely broad parameters as grounds for testing and allows an employee's first line supervisor almost unlimited discretion to order a urinalysis drug test. They correctly point out that the Plan permits testing with absolutely no indication that the employee was in any way responsible for the accident. Defendants submit that the Plan is "virtually identical to that upheld by the Supreme Court in *Skinner*" and should be allowed to proceed. Brief at 22. It further argues that several of the testing thresholds under the DLA Plan are higher than that approved in *Skinner* and involve significant property damages and/or personnel injuries.

In *Skinner*, the Supreme Court approved testing following (1) a "major train accident" defined as an accident that involved (i) a fatality, (ii) the release of hazardous material accompanied by an evacuation or a

---

3. The plan also provides that testing of employees involved in Class E mishaps or unsafe practices not posing an immediate threat to health and safety or national security shall be conducted under the guidelines of reasonable suspicion testing. Accordingly, because reasonable suspicion testing is not to be implemented until 1991, see discussion under "Reasonable Suspicion testing" *supra*, this practice need not be addressed by the Court.

reportable injury, or (iii) damage to railroad property of $500,000; (2) an "impact accident" defined as a collision that results in a reportable injury, or in damage to railroad property of $50,000 or more; or (3) any train incident that involves a fatality to any on duty railroad employee. *Skinner*, 489 U.S. at ——, 109 S.Ct. at 1408, 103 L.Ed.2d at 654. After the occurrence of any of the "triggering events" the railroad would transport all crew members and other covered employees "directly involved in the accident or incident" to a facility for blood and urine samples. *Id.* at ——, 109 S.Ct. at 1409, 103 L.Ed.2d at 655. The testing regulations provided a limited exception from testing if the railroad representative could immediately determine, on the basis of specific information, that the employee had no role in the cause(s) of the accident/incident. No exception was allowed, however, in the case of "a major train accident." *Id.* at —— n. 2, 109 S.Ct. at 1409 n. 2, 103 L.Ed.2d at 655 n. 2. The Court upheld the post accident testing, noting that such testing may "help the railroads obtain invaluable information about the causes of major accidents ... and to take appropriate measures to safeguard the general public." *Id.* at ——, 109 S.Ct. at 1420, 103 L.Ed.2d at 668 (cites omitted). In holding that such testing was reasonable, the Court stressed that the tests were of a "standardized nature" and provided for minimal discretion to be exercised by the railroad employers in choosing the employees who must submit to testing. *Id.* at ——, —— n. 6, 109 S.Ct. at 1415, 1416 n. 6, 103 L.Ed.2d at 663, 663 n. 6.

Subsequent decisions have outlined additional factors to be considered in evaluating post accident testing plans. In *AFGE v. Sullivan*, 744 F.Supp. 294 (D.D.C.1990), the Court granted the plaintiffs' request for a preliminary injunction enjoining the Department of Health and Human Services post accident testing plan. Noting that *Skinner* had relied heavily on the fact that the railroad employees were involved in "safety sensitive tasks," the court found that the HHS plan which allowed testing of any employee for any accident resulting in as little as $1,000 of damage, without indi-

cation that the employee was engaged in a safety-sensitive position, or that the employee was at fault, was too broad. The court found that there was no diminished expectation of privacy on behalf of all these employees and stated that the test was simply too invasive. *Id.* at 302. In *Connelly v. Horner*, Civ. No. C88–5085 DLJ, 1989 WL 125011 (N.D.Ca. June 15, 1989), the Court enjoined the United States Office of Personnel Management's ("OPM") accident testing plan, which allowed for testing when an accident caused an injury requiring hospitalization or property damage over $1,000. The court found that the government's interest in deterring on-duty related accidents of OPM employees was much less than its interest in the railroad industry, noting that OPM employees do not engage in "duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 21; quoting *Skinner*. The court also noted that the OPM plan allowed testing at a much lower threshold than the *Skinner* plan.

In *AFGE v. Wilson*, Civ. NO S–89–1274 LKK, 1990 WL 208749 (E.D.Cal. July 9, 1990), the court enjoined portions of the Accident/Safety Mishap portion of the Air Force Civilian Testing Plan, which allowed testing of employees who had been involved in (a) an accident resulting in $1 million in property damage, or a fatality or permanent total disability, or destruction of an Air Force Aircraft (class A mishap); (b) accidents resulting in between $200,000 and $1 million in property damage, or a permanent partial disability or the hospitalization of five or more personnel (class B mishap); (c) accidents resulting in between $10,00 and $200,000 in property damage, or an injury or occupational illness resulting in more than one full lost work day of eight hours (class C mishap); or an accident involving nuclear weapons. *Id.* at 6. The court upheld the testing following class A and B mishaps, finding them to be indistinguishable from those approved by the *Skinner* plan. It also upheld the testing following a nuclear weapons mishap, due to the equally serious consequences. It en-

joined the testing of employees involved in class C mishaps, however, finding that the government interest in deterring serious accidents did not appear to be present in class C mishaps, which involved only "minor physical injury and minimal property damage." *Id.* at 32. The court also stated that the entire civilian Air Force population did not have a diminished expectation of privacy, and that the government's interest did not outweigh the privacy expectations of plaintiffs. *Id.* at 31–33.

In *NTEU v. Yeutter,* 733 F.Supp. 403 (D.D.C.1990), the court refused to enjoin the Department of Agriculture's post accident testing plan, stressing that the plan required that an individual apparently caused one of the triggering events before he or she could be required to provide a urine sample. The court found that this requirement "substantially reduce[d] the legitimate expectations of privacy of the ... employee because such a requirement, while not an exact substitute for particularized suspicion that an employee is impaired by drugs on duty, is an acceptably close one." *Id.* at 417.

In *AFGE v. Cheney,* Civ. Nos. C88–3823, C89–4112, C89–4443 (N.D.Cal. March 15, 1990), the court enjoined the post accident testing plan of the Department of the Navy's plan for testing civilian employees. The Navy Plan mandated drug testing for any employee involved in an on the job accident or who engaged in unsafe, on duty, job related activity. The criteria for determining accidents or unsafe practices was to be established by the local activity/command. The court balanced the Navy's interest in implementing post accident testing against the employee's reasonable expectation of privacy. The court agreed with the *Yeutter* requirement that "one prong of the test for constitutionality of post accident testing ... is that the testing apply only to employees who may have caused the accident." *Id.* at 36. The court concluded that this requirement had been met in the Navy plan. The court did not approve of the lack of criteria for test-

ing, however, noting that *Skinner* set a high threshold. The Navy plan allowed the local command to establish any criteria. The court also noted with disapproval that the plan applied to all civilian employees not just those involved in high risk positions.

In the case before me, I find the post accident testing plan to be overly broad. Although the Plan does contain specific criteria as to dollar amounts and injury levels, the Plan provides for testing of "all employees *involved* ... in mishaps." Like the *Yeutter* court, I believe that post accident testing of all employees is an infringement of fourth amendment rights, and must contain some substitute for particularized suspicion. 733 F.Supp. at 416–17. In *Yeutter,* however, the Plan in question provided for urinalysis when an employee had "on the job apparently caused" an accident or "triggering event." 733 F.Supp. at 406, 416. *See also, Connelly v. Newman,* 753 F.Supp. 293 (N.D.Cal.1990) (fourth amendment requires that post accident testing covers only employees that may have caused the accident). In the DLA Plan, however, the employee must merely be "involved" in an accident. Mere "involvement" allows testing of a much broader range of employees, in situations where there is no reason for an employee to have a diminished expectation of privacy.[4] For instance, it seems to the court that under the DLA Plan, a DLA employee who was "rear-ended" while sitting at a stop light while driving a car could be subjected to a urine test. Even if it was clear that the employee was in no way at fault, he or she would have been "involved" in a mishap and subject to testing. Similarly, a DLA employee who was a passenger in a car, perhaps driven by a DLA "motor vehicle operator" that was involved in an accident could be subject to testing, even if she or he was clearly without fault. Or, a DLA employee, sent to investigate a spill or a fire resulting in significant money damage, could be overcome by fumes or smoke inha-

---

**4.** According to The American Heritage Dictionary of the English Language, "involve" is defined as: "[t]o contain or include as a part."

The American Heritage Dictionary of the English Language 690 (1981).

lation and be subject to testing, again, despite his or her total lack of fault for the underlying accident.

I believe that the DLA accident or unsafe practice portion of the Plan infringes on employees' legitimate privacy expectations by calling for drug testing without any showing that the employee was the cause of the accident or mishap in question. Accordingly, plaintiffs have a likelihood of success on the merits in their claim against this portion of the Plan as it is currently written, and the balancing of the harm weighs in favor of granting plaintiffs' request, and protecting the public's right to constitutional protections. It may be that a post accident plan could be developed which would not infringe upon legitimate fourth amendment expectations; however, as the *Sullivan* court stated:

> [i]t is not the task of the Court to propose subcategories which might meet constitutional standards; rather the burden is on the agency 'to redefine a new category of employees,' who may legitimately be subject to this kind of testing.

*Sullivan*, at 302, quoting *Harmon*, 878 F.2d 484, 491 n. 10. Accordingly, I will grant plaintiffs' request for a preliminary injunction as to the post accident and unsafe practices portion of the DLA Plan.

## IV. SECURITY

In *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir.1978), the Sixth Circuit held that a trial court must exercise the discretion required of it by Fed.R.Civ.P. 65(c) and expressly consider the question of requiring a bond before issuing a preliminary injunction. *Roth*, 583 F.2d at 539. However, it also recognizes that the actual requirement of a bond is discretionary with the trial judge. *Id.; USACO Coal Co. v. Carbomun Energy, Inc.*, 689 F.2d 94, 100 (6th Cir.1982) (amount of security given by applicant for an injunction is matter of discretion for trial court, which may require no security at all). In this case, I do not believe that the possibility of material damages will follow the partial granting of plaintiffs' motion. Accordingly, I will not require the posting of a bond. *See Urbain v. Knapp Brothers Manufacturing Company*, 217 F.2d 810, 816 (6th Cir.1954). *See also Crowley v. Local No. 82, Furniture and Piano Moving*, 679 F.2d 978, 1000 (1st Cir. 1982) (no bond required in suits to enforce important federal rights or public interests).

## ORDER

In accordance with the opinion entered this date:

IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART, as follows:

IT IS ORDERED that defendants are enjoined from implementing random urinalysis testing as described in Part IX of the Defense Logistics Agency Drug Free Work Place Plan of January 2, 1990 of DLA employees in the following positions: investigators, criminal investigators, fire protection inspectors, environmental protection specialists who do not inspect or handle hazardous wastes and do not act as first line spill coordinators. Defendants shall not perform any such testing without further order of this Court.

IT IS FURTHER ORDERED that defendants are enjoined from implementing accident or unsafe practice testing as described in Part XII(A) of the Defense Logistics Agency Drug Free Workplace Plan of January 2, 1990. Defendants shall not perform any such testing without further order of this Court.

IT IS FURTHER ORDERED that no bond is required for reasons discussed in the accompanying opinion.